RICHARD H. McLEOD et al., plaintiffs in error, vs. THE SA-
VANNAH, ALBANY AND GULF RAILROAD COMPANY, defen-
dants in error.

The Legislature, in 1806, authorized Joseph Hill to erect a toll bridge across the
Great Ogechee, at a particular place; and the Act provides that it shall not be
lawful for any one to erect any other bridge within five miles above or below.
The toll bridge was built, and has been kept up ever since.  In 1847 and 1851, the
Legislature authorized the construction of a railway across the same river, between
Savannah and Albany, which would necessarily cross near the first bridge, and
which was actually carried across, within a mile and a half below the same.

*Held*, That the franchise granted to the Railroad Company was not the same as
that conferred on the first grantee, nor so similar as to be deemed an infringement
upon the prior charter, in the sense in which a new bridge or ferry interferes with
one previously established at the same point; and that no injunction will be gran-
ted, nor compensation decreed, by way of damages in such case.

In Equity, from Chatham county.  Decided by Judge
FLEMING, January Term, 1857.

Richard H. McLeod and William F. Law, trustees of Sa-
rah E. King, and William King, the husband of the said Sa-
rah E. King, and others, filed their bill of complaint against
the Savannah, Albany and Gulf Railroad Company.

To this bill of complaint the defendants filed a general
demurrer.

After argument, the Court below gave the following de-
cision, in which will be found a statement of the facts of the
case:

In 1806 the Legislature of Georgia granted to Joseph Hill,
his heirs and assigns, the right to build a toll bridge across
the Great Ogechee at a designated place.  The fifth section
of this act provides " that it shall not be lawful for any per-
son or persons, at any time or times, to build any bridge or
keep any ferry on the river Great Ogechee, within five miles
either above or below the said bridge, which is hereby ex-
clusively vested in the said Joseph Hill, his heirs and as-
signs."  The above fifth section contains the obligation of
the public entered into through the Legislature, to Joseph
Hill, his heirs and assigns.  The consideration of this ob-

ligation is, "that the said Joseph Hill, his heirs or assigns, shall erect the said bridge in a complete and substantial manner, at least sixteen feet in width, and capable of sustaining and passing over *all carriages in common use,* within three years from the date of the Act, and rebuild the same when necessary, and keep the said bridge in good and sufficient repair forever." They fix the tolls he is to receive by saying, that they shall be the same as are provided for in the Act of 1790 to Wade Hampton and James Green. In that Act the tolls are particularly specified for "loaded wagons and other four wheeled carriages, for empty carts and drays, for a man and horse, for foot passengers, for black cattle, for hogs sheep and goats, for rolling hogsheads drawn by horses." From this it necessarily follows that the bridge to be erected by Hill was to be capable of sustaining and passing over, not only all carriages in common use, but also horses, foot passengers, black cattle, hogs, sheep, goats and rolling hogsheads. The above, then, is the obligation of Hill to the public, the consideration of which is the exclusive privilege granted to him. The bill alleges and the demurrer admits, that Hill and his assigns have fulfilled their part of this contract, they are therefore entitled to all the rights, privileges and emoluments granted in the charter. The only question is, whether the bridge constructed by the defendant infringes upon those rights and privileges, and *thereby* takes away, or destroys, or depreciates the value of those emoluments. I say *thereby,* because although subsequent legislation may impair or destroy the value of a franchise, previously granted, yet if the subsequent legislation does not violate the exclusive privilege previously granted, the party has no right to complain. For the party to have a right to redress, the subsequent legislation must have been *prohibited* by the first. This I understand to be now the settled doctrine of this country, and I also understand that this is admitted by the counsel for complainants.

McLeod et al. vs. The Savannah, Albany and Gulf R. R. Co.

`But to return : The question for my decision is, whether the bridge constructed by defendant is a violation of the exclusive privilege of the complainants. I enter upon the consideration of this question with great diffidence, not only because of its intrinsic difficulty, but because the few decisions to which I have been referred in the argument, are inconsistent with each other. Acknowledging my indebtedness to the very able argument of counsel on both sides, I proceed to the consideration of the question before me.

In the case of *McLeod and others vs. Burroughs,* the Supreme Court of Georgia say : "The Act of 1806 is a contract between the grantee, Hill, and the Legislature; both parties are *bound* by its stipulations; what its meaning is, is for the Courts to determine. The grantee 'proceeds to invest under it according to his understanding of its provisions. He does so at the peril of a different construction by the Courts ; they can only act when a case is made." The case is now made, and the duty is upon me to construe this contract between Hill and the Legislature.

One principle and an important principle in the construction of this contract between Hill and the public, is stated by the Supreme Court in the case from which the above quotation is made, and in which case this very charter to Hill was before the Court. They say : The exclusive privilege (meaning the exclusive privilege to Hill) "is in derogation of a common right, and the act which confers it *must be strictly construed."* By strict construction I understand that nothing is to be considered as granted which is not expressly *granted*; in other words, nothing is to be considered as granted by *implication.* What then is expressly granted to Hill in this charter ? The exclusive privilege is expressly granted him of erecting and keeping a bridge across the Great Ogechee, for the passing over of all carriages *in common use,* for the passing over of horses, foot passengers, cattle, hogs, sheep, goats and rolling hogsheads. Now a railroad bridge constructed for the purpose and the *exclusive* purpose of sus-

taining and passing railroad cars, is not a bridge capable of sustaining and passing carriages in common use, or any other article or thing for which Hill is entitled under his charter to charge toll, with the single exception of foot passengers. [Passengers in carriages are not liable to pay toll, they only pay for the carriages in which they pass.] Railroad bridges are incapable, not because they want strength, but because they are not so constructed as to permit the passing of anything but railroad cars. Foot passengers may get over, though not very safely, and the railroad is bound to prevent it or respond in damages. The question of damages from this cause, however, is not before me, the bill having made no charges or allegation as to this matter. To construe the exclusive privilege of Hill as extending to a railroad bridge, constructed for the exclusive purpose of passing their cars, you must resort to implication ; you cannot find it *expressed* in the words of the grant. The moment you extend it to such a bridge, you violate the principle of *strict construction*, which the Supreme Court say, " is the rule for construing this charter—it being in derogation of a common right."

Again: This charter is a contract between Hill and the public. The obligation of the one is the consideration for the obligation of the other. Precisely, then, where the obligation of the one stops, the obligation of the other stops also. The obligation of each is a safe and just rule for measuring the obligation of the other. Now I ask, is Hill under his charter bound to furnish a bridge capable of sustaining and passing railroad cars ? [Let it be remembered that five miles *is not* the exclusive privilege, but *the limits within which* the exclusive privilege is to be exercised.] If the Legislature in granting to the defendant the authority to build this bridge, violated the exclusive privilege of Hill, it must be because Hill's charter granted to him the exclusive privilege of building it. The privilege and the obligation of Hill are coextensive—they go hand in hand, and where his privilege stops, his obligation stops, and where his obligation

McLeod et al. vs. The Savannah, Albany and Gulf R. R. Co.

stops, his privilege stops. What is his obligation? His obligation is to furnish the public with a bridge capable of sustaining and passing all carriages in *common use*. Now there can be no question that this means carriages in common use at the time the Act was passed; railroad cars were not in common use at that time; indeed, they are not in common use now, being used exclusively by railroads. Hill, then, is under no obligation to furnish a railroad bridge, and if that is not his obligation, then it is not *the privilege* exclusively granted him in his charter. And if it be not his exclusive privilege, how can it be a violation of that privilege to grant it to another? I repeat, the obligation and the privilege of Hill go together, and where his obligation stops, his privilege stops also.

Again suppose (and in this age of great, and wonderful, and rapid improvement almost any supposition may be realized,) suppose that all carriages in common use at the time Hill's charter was granted should cease to be used at all, and that carriages should come into common use propelled by steam, electricity, condensed air, or any other motive power, that in the march of human improvement may be discovered, and which carriages the bridge of Hill could not sustain and pass over: would Hill or his assigns be compelled by the terms of their charter to furnish a bridge capable of sustaining and passing these new vehicles? I apprehend not; they could say, and doubtless would say, we are only bound to furnish a bridge capable of sustaining and passing carriages in common use at the date of our charter. Well, if they are not bound, then it is not their exclusive privilege, and if not their exclusive privilege, then it is no violation of that exclusive privilege to authorize some one else to erect a bridge capable of answering the wants and necessities of the public. The supposition I have made, is, I grant, a very improbable one, but no man acquainted with the improvements of the last fifty years will say that it is an impossible one.

But be this as it may, it is a stronger case for the complainants than the one actually before me. In the case I have supposed, it might be contended by Hill and his assigns that it was their exclusive privilege to furnish a bridge for the passing of carriages in common use, *without reference to the date of their charter.* I have no idea that this position could be maintained in any Court of justice, but there would at least be some foundation for an argument. The case before me is very different. Railroad cars, as already stated, are not in common use. They are used only by railroads. Hill and his assigns, under no possible construction of their charter, can be held bound to furnish a bridge capable of sustaining and passing them. Now if I am right in the proposition that when the obligation of Hill stops, his privilege stops, and that when his privilege stops, all restrictions upon the public stop, then it would be no violation of the charter of Hill, to authorize the defendant or any one else, to erect a bridge capable of sustaining and passing railroad cars.

If the wants and necessities of the public require such a bridge, and the charter of Hill *does not bind him to furnish it,* then it is not only the *right* but the *duty* of the Legislature to authorize some one to provide it. This cannot be a violation of Hill's charter, for the right and privilege of furnishing a bridge, except for the passing of carriages in common use, was never vested in him. In other words, Hill and his assigns have no exclusive privilege of building a bridge for the passing of railroad cars. The prohibition to the Leglslature stops where the exclusive privilege of Hill stops.

This reasoning, however, will not avail, if it be true, as contended by complainant's counsel, that the Legislature *has not authorized* the defendant to build their bridge within the exclusive limits of Hill. The charter of the defendant grants the right to build a road from the " City of Savannah, or *some point on the Central Railroad, near Savannah, to Alba-*

ny on the Flint river, with express power to adopt such route as the said company may select." This necessarily involves the power to build a bridge across the Ogechee somewhere. Are the five miles excluded? They are if a bridge within those five miles would be a violation of Hill's charter. But if I have been right in the views I have submitted, a bridge within the five miles, for the passing of railroad cars, *would not be a violation* of Hill's charter. The same reason that would make a bridge *beyond* the five miles lawful, applies to a bridge *within* the five miles. Why would a bridge beyond the five miles be lawful? Because it would not violate the exclusive privilege of Hill. Then a bridge within the five miles would be lawful for the same reason, because it would not violate the exclusive privilege of Hill. The charter of defendant, in my view, grants the power to build a bridge for the passing of their cars across the Ogechee at any point where the route selected should strike it, provided the said bridge should not interfere with any chartered rights. I have shown, or at least attempted to show, that the bridge in its present location, does not interfere with any chartered rights.

The above is also an answer to another proposition of complainants' counsel, that even if the Legislature have granted the authority to build a bridge within the exclusive limits of Hill's charter, such act of the Legislature would be unconstitutional and void. The act of the Legislature cannot be unconstitutional, unless it violates the charter of Hill; but I have already decided that it does not violate the charter of Hill.

The demurrer is sustained, and the bill dismissed with costs.

To this decision the complainants' counsel filed their bill of exceptions, saying that the Court erred on the following grounds:

1st. Because his Honor the Judge erred in deciding that the bridge constructed by the Savannah, Albany and Gulf

Railroad Company, thereby taking away, or destroying, or depreciating the value of the franchise previously granted to the complainants, did not violate the exclusive privilege previously granted to the complainants.

2d. Because his Honor the Judge erred in deciding that the bridge erected by the Savannah, Albany and Gulf Railroad Company across the Ogechee river, did not violate the exclusive privilege previously granted to Joseph Hill, his heirs or assigns.

3d. Because his Honor the Judge erred in deciding that the bridge erected by the Savannah, Albany and Gulf Railroad Company across the Ogechee river, did not violate the fifth section of the act of the Legislature of Georgia, providing that it should not be lawful for any person or persons, at any time or times, to build any bridge or keep any ferry on the river Great Ogechee, within five miles either above or below the said bridge, which was by the said Act exclusively vested in the said Joseph Hill, his heirs and assigns.

4th. Because his Honor the Judge erred in deciding that the bridge erected by the Savannah, Albany and Gulf Railroad Company over the Great Ogechee River, is not a violation of the exclusive privilege previously vested in Joseph Hill, his heirs and assigns.

5th. Because his Honor the Judge erred in sustaining the demurrer and dismissing the bill.

WARD, OWEN & JONES for complainants.

LAW, BARTOW & LOVELL, *contra.*

*By the Court*—LUMPKIN, J. delivering the opinion.

This is a proceeding in equity at the instance of Wm F. Law and others to restrain by injunction the Savannah, Albany and Gulf Railroad Company from using a bridge constructed by them on the Great Ogeechee river; or by an alter-

native prayer, to compel them to pay damages for a disturbance of the franchise vested in complainants, as the assignees of Joseph Hill.

By an Act of the Legislature of Georgia, passed the 26th of June, 1806, the exclusive right of erecting a bridge over the great Ogechee, at a place designated in the Act, and on certain specified conditions, was vested in Joseph Hill, his heirs and assigns, *Clayton's Dig. p.* 298. The grant is in these words: "It shall not be lawful for any person at any time or times to build any bridge or keep any ferry on the said river, great Ogechee, within five miles, either above or below said bridge, which is hereby exclusively vested in the said Joseph Hill, his heirs and assigns."

The complainants aver themselves to be the assignees of Joseph Hill, the grantee; and that all the conditions of the Act obligatory on them, have been duly complied with.

By an Act of the Legislature, passed the 25th of December, 1847, and amended the 20th of December, 1857, a company was incorporated by the name of the Savannah and Albany Railroad Company; and invested with all the privileges of any other railroad company, for the purpose of constructing a road from Savannah or some point on the Central Railroad near Savannah to Albany on the Flint river, with express power to adopt such route as the company may select. The defendant has selected a route which crosses the great Ogechee river within five miles below the bridge erected by Hill, and now in the hands of his assignees, the complainants, over which their trains are carried in the prosecution of their business.

The complainants did not attempt to restrain the defendant in any other way, except by a written notice, from building the bridge; a copy of which is attached as an exhibit to their bill. They now pray for an injunction to restrain the defendant from using their bridge, alleging its construction to be a violation of the Act of 1806; and an infringement upon their exclusive grant; or in the alternative, such com-

pensation by way of damages as a Court may decree to be fit and proper.

To this bill the defendant has filed a general demurrer, and the great question raised by the demurrer is, and which goes to the whole bill, whether the construction by the defendants of their road across the great Ogechee river within five miles of the old bridge is a violation of the exclusive right vested in the complainants? If it be decided in the negative, the bill of course contains no equity.

That the defendants pass the great Ogechee river constantly with their locomotives and trains on a structure they have laid across said river within the limits secured to the complainants, is not denied. That this structure is not only called a bridge, but that it was erected for the safe and expeditious passage of passengers and freight, whether from greater or less distances, over this stream, in the cars or carriages, provided for that purpose, is not disputed. Still the defendant insists, that notwithstanding all this, theirs in not such a bridge as was contemplated by the complainants' charter; and upon this single point this case rests.

It is too late perhaps to deny, that the franchise granted in 1806, is a contract. The decision of the Supreme Court of the United States, in the celebrated Dartmouth College case, has imposed that doctrine, at least for the present, upon the Courts of this country, whether it be irreversibly established, time alone can show. Nor need counsel argue so earnestly, or declaim so eloquently, in favor of the inviolability of contracts. The sole inquiry for us is, the true exposition of the charter of 1806. Settle that, and the controversy in this case is ended. For while it is admitted, that individual interest must be subservient to that of the public, and must yield when the public necessity requires it; and that chartered rights no more than any others, are exempt from this paramount right of the State, to take private property for highways or any other public purpose, still neither in this, nor any other

constitutional government, will this be done, without making to the individual aggrieved, just compensation.

Grant that the franchise in this case is as broad as complainants contend it is, still, if a crossing for the Savannah and Albany Railroad would have been impossible at any other place, the old bridge site itself might have been seized and appropriated for this purpose, by virtue of the power of eminent domain residing in and reserved to the people of the State; making due compensation of course to the proprietors.

We come back then to the enquiry, have the chartered rights of the complainants been violated by the defendant?

No one pretends, that the structure erected over the Ogechee river, by the defendant is not a bridge. But is it a bridge in contemplation of the Act of 1806? Repudiating as I always do, the two modes of construing the statutes referred to by law writers, the one literal and the other liberal, I ask, as the only true guide, what did the Legislature mean? For having ascertained that, we cannot bind them beyond what they intended to bind themselves. Otherwise you force upon the public the performance of a contract which they never made.

The Legislature granted to Joseph Hill the privilege of erecting a bridge, and when from accident or decay, it became impassable, they granted also, the free and quiet enjoyment of a ferry on the same conditions as those of the bridge. They granted the privilege of erecting a toll bridge, capable of sustaining and passing all carriages in common use, at the date of the Act; and in the contingency stated, of keeping a ferry for the purpose of passing such carriages. They allowed, to Joseph Hill, the same tolls that were already allowed to Wade Hampton and James Gunn, by the Act of 1790; and I would here remark, that a charter had been granted to Wade Hampton, and General James Gunn, and a bridge was erected; but the franchise to these grantees was

revoked by the Act of 1806, on account of alleged misuser; but without any judicial forfeiture having been declared.

But to resume. The Legislature in the grant to Hill specified the kind of bridge to be built, and the purposes to which the exclusive privilege applied, by the tolls provided for in that Act, which were, for loaded wagons, and other four wheeled carriages; for empty carts and drays; for a man and horse; for foot passengers; for black cattle; for hogs; sheep and goats; and for rolling hogsheads drawn by horses.

These provisions are sufficient to satisfy any one, that the exclusive privilege granted to Joseph Hill, was that of erecting a bridge for the transit of carriages then in common use; and for the other articles enumerated in the Act of 1790; and that consequently the protection secured to him by the 5th section of the Act of 1806, was a corresponding protection; that is, a protection against the erection of any similar bridge used for similar transportation; and that it cannot be extended without doing violence to the obvious meaning and true intent of the grant, to the construction by a railroad company, under Legislative sanction and authority, of a bridge for the sole purpose of affording transit for its cars.

But this point is put beyond all dispute from the fact, that railroads at that distant day, were wholly unknown in this country. Therefore the Legislature could not have meant to guard against interference by a mode of crossing, of the very nature and existence of which they had no knowledge.

Whether then we look to the language of the Act construed with reference to the subject matter, to the intention of the Legislature, interpreted by the state of things existing at the date of the Act, to the situation of the parties, or to the thing granted—its nature and use at the time, it seems clear that the prohibitory clause in the Act of 1806, cannot, in justice and fairness, be made to extend to a bridge, erected for the transit of the cars of the railroad company, and for tha

purpose alone; the said clause being utterly irrelevant to that sort of bridge.

But it is insisted that all this can make no difference, and the question is propounded, can a grant of this kind be in-fracted, because an advantage not contemplated at the time, may result from its violation. It is asked, is there any im-plied condition in such a grant, that upon some new im-provement being made, the grant should be void?

Without stopping to examine whether this be a candid mode of meeting the difficulty, we understand it to be now solemnly settled, that the grantee in such a case as this, can take nothing by implication. *Charles River Bridge vs. War-ren Bridge*, 11 *Peters*, 420; *Shorter vs. Smith*, 9 *Ga. R.* 517. And further, that the rule which requires the grant to be ta-ken most strongly against the grantor, does not apply to a Legislative Act. But that on the contrary, any ambiguity in the terms of a charter, shall operate against the grantees; and that grants of exclusive privileges to corporations or in-dividuals are to be strictly construed. And that if the terms of the contract are doubtful, the doubt must enure to the benefit of the public. *McLeod et al. vs. Burroughs*, 9 *Ga. R.* 220, 221, 222; *Justices of the Inferior Court vs. Plank Road Company,* 9 *Ga. R.* 479, 480; *Devarris on Statutes*, 40, 41, *et seq.* 48; *Mayor of Macon vs. M. and W. Railroad*, 7 *Ga. R.* 227.

Our conclusion is, that the structure on the great Ogechee river by the defendant, is part of the railway only; and not a bridge in the sense of the charter of 1806. Certainly it is not a toll bridge in the meaning of the franchise granted to Joseph Hill. That if the value of the complainants' fran-chise be impaired by the Acts of 1847 and 1851; still this does not impair the obligation of the contract entered into by the State, with Joseph Hill; there being nothing in that contract to deprive the people of Georgia of the benefits of the new system of intercommunication introduced by the invention of railroads; nor to forbid the passage of a law

authorizing the construction of a railroad at the place in question. Indeed for myself, I am strongly inclined to think, the Dartmouth College case to the contrary notwithstanding, that it was not in the power of the Legislature of 1806, to make a contract, of the character that this is claimed to be, which should have the effect of taking from their successors, for all coming time, the right of opening any such new methods and channels of trade and travel, as their posterity, at the end of a half century, might deem essential to the comfort, convenience and prosperity of the present and future generations.

It is yielded in the argument, that it is not the line of travel, but the right of portage merely, that has been granted to the complainants; and that the defendant could tunnel the river and cross immediately under the complainants' toll bridge. In my judgment, this surrenders the whole case. For we have seen, that there is no such magic in the mere word bridge, that can constitute the right to interfere in this case.

On the one hand, the railroad bridge can be used merely for the appropriate purpose of passing locomotive engines, and trains of cars on their way between the termini of the road and the various intermediate stopping places; and is incapable, as a bridge, of being used for the passage of any vehicle, animal or even foot passenger for whose passage the complainants are entitled to receive toll: and therefore does not violate the charter granted to Hill. And on the other hand, complainants' bridge has not the capacity to carry over the river the company's engines and trains; and even if they could, it would be questionable, whether they would be entitled to collect toll for the same. The franchises are totally different and do not interfere the one with the other; what is the defendant to do? They have a right of transit across the river. The complainants cannot and will not pass them. Are they not entitled to provide the means of crossing themselves? A caravan arrives with an enor-

mous elephant, the old bridge is too weak to bear the weight of the animal. The proprietor refuses to put him over. Have not the owners a right to provide the means by flat or otherwise to transport their property?

But we forbear to discuss the question. The identical principle involved, has come before the Courts of New York, and been solemnly adjudicated adversely to the claim set up by the complainants in their bill. In the case of the *Mohawk Bridge Company against the Utica and Schenectady Railroad Company, 6 Paige, 564.* Chancellor Walworth says: "Neither is the Legislature deprived of the power to provide for the conveyance of freight or passengers, from one part of the State to another, by an improvement which was entirely unknown, at the time, when the grant to the bridge company was made. And if the grant had in terms given to the corporation the exclusive right of erecting a toll bridge across the river at Schenectady, this subsequent grant to the railroad company to cross the river with their railway from Schenectady to Utica, and to transport passengers thereon, in the ordinary course of their business, in the conveyance of travelers from one place to another, would not have been an infringement of the privileges conferred by such prior grant; as the railroad bridge would not be a toll bridge, within the intent and meaning of the grant to the first company."

I am aware that a decision has been made in Connecticut counter to those in New York. But it is New York, and not Connecticut, that has given the law to the States of this Union, as the history of our jurisprudence will demonstrate.

It is needless to kick against the pricks. Old things must give place to new. The forest must yield to the waving harvest and golden fruit; the red man of the woods to the sturdy and stalwart Saxon; the turnpike to the canal, and both to the railway. The complainants' were free to abandon their bridge at any time, as did Hampton & Gunn, and there was none to molest them. There was, in this respect, no mutuality in this, so called, contract. And if their profits

have been impaired by this new mode of travel and trans-portation across rivers and morasses, they stand in no worse situation, and are no more entitled to compensation, than are thousands of individuals throughout the land, who are daily subjected to losses and ruin by new inventions and improve-ments, superseding and displacing those already in use. They have reaped no doubt, long ago, twice-told, the money they have expended, and should be satisfied with a mono-poly of a half a century, granted improvidently, if not illegal-ly—the prior right to Hampton & Gunn, never having been judicially forfeited. 3 *Kent,* 458 ; *Thompson vs. The People,* 23 *Wendell,* 579, 580, 596.

By my direction, my friend Mr. Smale, assistant Reporter, has inserted entire, in the bill of exceptions, the admirable judgment pronounced in this case by our brother FLEMING ; from whom, whenever I have the misfortune to differ, which has been but seldom, I suspect the soundness of my own opinion. Would that the briefs of the able counsel who so thoroughly investigated this question, were allowed by law to be reported. Their omission in this and other cases is an irreparable loss to the profession. To their labors I am greatly indebted for the alleviation of my own.

Judgment affirmed.

BENNING, J. concurring.

The Savannah, Albany and Gulf Railroad Company erec-ted a bridge for their Railroad, across the great Ogechee, "within five miles" of the toll bridge of the plaintiffs in error.

The charter of the company said what was equivalent to saying, that they might erect this bridge.

The fifth section of the Act of 1806, authorizing the erec-tion of the toll bride, has these words: "it shall not be law-ful for any person or persons, at any time or times, to build any bridge, or keep any ferry, on the great Ogechee, within

five miles, either above or below the said bridge," (the toll bridge,) " which is hereby exclusively vested in the said Joseph Hill, his heirs, and assigns."

The second section had given to Joseph Hill, his heirs and assigns, the exclusive privilege of erecting the toll bridge.

The fourth section gave him the right to receive " a toll equal to that," theretofore, " granted to" " Wade Hampton and James Gunn."

The toll granted to them was, "for every loaded wagon, and other four wheeled carriage, four shillings and eight pence; for every empty wagon, two shillings and four pence; "for every loaded cart, or other two wheeled carriage, two shillings and four pence; for every empty cart, or dray, one shilling and two pence; for a man and horse, six pence; for a a foot passenger, three pence; for all black cattle per head, three pence; for hogs, sheep, and goats, two pence; for every rolling hogshead with two horses, and drawn, one shilling and two pence; for every rolling hogshead with one horse, and drawn, one shilling and no more." *Watk. Dig.* 420.

The question may be stated in general terms, to be this : Have the plaintiffs, the owners of the toll bridge, a right to sue the Railroad Company, for the erection of the railroad bridge ?

The Court below held that they have not; and I think, that it held right.

[1.] Grants of monopolies from the Legislature, like the grant contained in the Act of 1806, are to be construed strictly, so as to make them convey as little as possible.

This Court, speaking of this very grant, said, that such grants are to be strictly construed." *McLeod vs. Burroughs*, 9. *Ga.* 221.

These grants from the Legislature, occupy in our law, much the same place, which, grants from the King, occupy in the English law ; and they must receive much the same construction. " By the" (King's) " grant of all mines in such a soil, altho' the grant be *ex certa scientia et mero motu*,

mines royal of gold or silver, shall not pass, but the words, (soil and mines,) shall be taken in a common sense; and to a common intent; but to have them pass, there ought to be special words." 1 *Coke* 46.    *The case of Allin Woods.*

According to this, the words, "any bridge," contained in the grant of 1806, are to "be taken in a common sense, and to a common intent." Taken in this manner they will no more include a railroad bridge, than will the words, "all mines," taken in this manner, include gold or silver mines. In 1806, when the words, "any bridge," were used, railroads and railroad bridges were unknown. It is therefore, impossible, that the legislature, in using the words, "any bridge," could have had railroad bridges in their mind.

I think, then, that the words, "any bridge," in the Act of 1806, do not include railroad bridges.

[2.] But, if I though they did, I should still think the plaintiffs not entitled to sue the defendants, or, at least, not entitled to recover of the defendants, more than nominal damages.

A toll bridge is a public highway over which, every body, with his goods and vehicles, has the right to pass. If there is a toll laid on him, or on his goods, or on his vehicles, he cannot pass without paying toll; if there is no toll laid on him or on his goods, or on his vehicles, he can pass without paying toll.

In the case of the present bridge, a man could pass the bridge, toll free, with a drove of mules or horses, or with camels, or elephants; or riding in a sleigh, or in a one wheeled carriage, for on none of these things is any toll imposed.

So, I suppose, for the same reason, the army, horse, foot, and artillery, could pass toll free.

In a word, every thing could pass; and every thing on which, no toll was laid, could pass toll free.

This being so, a railroad car, with its load of passengers, or freight, would have the right to pass the bridge toll free, for no toll is laid upon the passage of such a car. True, a

railroad car might find some difficulty in getting to, and over, the bridge ; but this does not affect the right; and, besides, a time may come, and, in the opinion of many persons, will come, when the steam engine, with its train of cars, will be seen running on the common roads.

But if this be so, then it can be no injury to the bridge, that railroad cars do not pass over it, but pass the river else. where ; it must be a benefit; it must be the means of sa-ving the bridge, from much wear and tear, if not, from des-truction, under the mighty weight of the strange engines and cars.

The case stands thus : The Railroad Company have the right to cross the toll bridge with their engines, cars, &c. toll free. They do not choose to insist on this right, but choose to cross on a bridge of their own ;—Can the owners of the toll bridge sue the Railroad Company for pursuing this course ? If they can, surely, it cannot be, that they are en-titled to recover more than nominal damages.

I think the judgment of the Court below ought to be affirm-ed.

McDONALD, J. dissented.