# MYRON C. LAKE, Appellant, v. THE VIRGINIA AND TRUCKEE RAILROAD COMPANY, Respondent.

Lake's Toll Bridge Franchise over Truckee River. The Utah statute authorizing Myron Lake to construct a toll road and bridge at a certain point across the Truckee river, and prohibiting the building of any other bridge within a mile thereof, (Stats. 1862, 19) does not prevent the building at the same point of a railroad bridge which is. to be used exclusively for railroad purposes.

Construction of Franchise Grants. Any ambiguity in the terms of the grant of a franchise must operate against the grantee and in favor of the public.

Railroad Bridge no Infringement of Toll Bridge. A grant to a railroad company to cross a river with its railway, and transport passengers thereon in the ordinary course of its business, is not an infringement of a previous grant of the exclusive right of a toll bridge over such river.

Railroad Improvements Favored by Legislation. In view of the territorial and state legislation in reference to railroads, it would require the clearest expression of legislative intention to uphold the grant of such an exclusive franchise of a toll road or bridge over a river, as would prevent railroad extension and improvement in the same direction.

Right to Tolls on Toll Roads and Bridges. A toll road and bridge franchise, which gives the right " to charge and collect from persons traveling over and along said road such rates of toll," &c., is not interfered with by a railroad company running alongside of it; for the reason, among others, that it does not carry persons in such a manner as to interfere with the collection of tolls from "persons traveling over and along said road."

"Railroad Bridge" not an Ordinary "Bridge." The crossing of a river by a railroad track on piers, or what is known as a "railroad bridge," is neither a bridge, a ferry, nor any public means of crossing by any ordinary method of travel, such as is contemplated in ordinary legislation concerning toll roads and bridges.

Appeal from the District Court of the Second Judicial District, Washoe County.

The facts are fully stated in the opinion.

*Ellis & King* and *R. M. Clarke*, for Appellant.

I. If Lake's right or franchise could be made exclusive as to wagons and horses, or the ordinary primitive modes of transportation, so also it could be as to railroads or any of the improved modes

of transportation. *Livingston* v. *Van .Ingen*, 9 John. 507 ; *Ogden* v. *Gibbons*, 9 Wheaton, 1 ; *Livingston* v. *Fitch*, 4 Sandf. 492; 1 Hill, 469 ; 2 Conn. 484; 7 Conn. 28; 16 Conn. 149; 22 Cal. 398 ; 5 Wend. 444; 20 Johns. 100 ;. 4 Pick. 180 ; 2 McLean, 377 ; 17 Conn. 93 : *Binghampton Bridge*, 3 Wall. 51.

II. The Utah act, when its requirements had been complied with by Lake, became an executed grant ; and any law of the state of Nevada which would operate against such grant, or to the destruction or infringement of the franchise, is unconstitutional and void. 6 Cranch, 136 ; 7 Cranch, 164 ; *People* v. *Platt*, 17 Johns. 195 ; 4 Wheaton, 518, 444 ; 1 Paige, 102 ; 17 Conn. 40.   Such right of franchise could only be taken for a public use in the exercise of the right of eminent domain upon compensation.

III. The structure of the defendant, which is being used as a railroad bridge for the transportation of locomotives, trains, persons and property, is a " bridge" within the meaning of Section 3 of the act.   17 Conn. 40.   Perhaps, before railroads were in use or known, when " any other bridge " was forbidden by law to be constructed or used within certain designated limits, it was with some show of reason decided that the law-making power, thus granting exclusive rights, could not have intended to include the new and improved mode of public conveyance called a railroad ; but in the case at bar, the exclusive right was granted in the midst of a railroad era, when the railway was one of the most ordinary means of transportation.

IV.   If the structure which is being used be not a " bridge " in the sense of the statute, it certainly is a " public means " for the conveying across said river of persons and property, which is equally forbidden under the law.

V.   The fact that the structure complained of is a part of a railroad, can make no difference.   The law would be the same if the railway was only one quarter of a mile in length, and designed only to transport persons and property across the river for toll, thus to avoid and destroy the franchise of defendant.   The fact that persons and property carried on the railroad come from greater or less distances, is immaterial.

*R. S. Mesick* and *W. S. Wood,* for Respondent.

I.   The structure complained of having been finished, ready to be used in connection with the railroad and connecting with the Central Pacific Railroad, the defendant is authorized by act of congress to use its road and the structure in question in spite of the Lake Act.   14 U. S. Stats. 66 ; *W. U. Tel. Co.* v. *A. & P. S. T. Co.,* 5 Nev. 102.

II.   The structure is not such in character or purpose as to constitute an infringement of the plaintiff's right.   *Bridge Proprietors* v. *Hoboken Co.,* 1 Wallace, 116 ; *Thompson* v. *N. Y. & Harlem R. R. Co.,* 3 Sandford, 625 ; *Mohawk B.* v. *Utica & S. R. R. Co.,* 6 Paige, 554.   It is not the thing which, in contemplation of law, was intended to be prohibited by the Lake Act. It is not a bridge ; nor a ferry ; nor a ford ; it is not a thing which the public is entitled to use, as a means of crossing the river.   It is not a public means for the conveying across said river of either persons or property, within the meaning of the act, which only contemplates public means of conveying persons and property, according to the ordinary meaning of the language.

III.   While the railroad vehicles are public, like the teams and stages of other common carriers engaged in a business to which the plaintiff's franchise does not relate, the railroad bridge is private, and not public, as the plaintiff's is and is required to be ; and the railroad bridge is incapable of interfering with the plaintiff's right, and so not unlawful.

IV.   Is it possible that the railroad company can be enjoined from crossing on its own bridge, whilst the plaintiff does not provide one which it can use ?   By maintaining a foot-bridge he cannot prevent the public from crossing their teams ; by providing a bridge for light carriages, he cannot prevent heavy freight wagons from crossing ; by providing for all these, he cannot prevent trains of cars, now the usual vehicles for transporting freight and passengers, from crossing ; and if he says he is not obliged by his charter to furnish crossing for trains because they were not in use at that place when his charter was granted, we answer that they

were not included within the meaning of the act as to his privileges.

• By the Court, WHITMAN, J.:

Appellant sought in the district court an injunction, "restraining defendant (respondent) * * * from conveying across Truckee river, within one mile on either side of plaintiff's (appellant's) bridge, either persons or property, by any bridge, ferry, or other public means of conveying persons or property," and for general relief. From an order refusing the injunction, this appeal is taken.

Appellant bases his claim upon a grant of the territorial legislature, set forth in his bill, the substance of which it is better to repeat here, as it will be necessary in the course of this opinion to make reference to its different features, and such will thus be more intelligible :

" An act to authorize Myron Lake, his heirs and assigns, to construct a toll road.        *        *        *        *        *

" Section 1.    That Myron Lake, his heirs and assigns, be and are hereby authorized to construct and maintain a toll road from the Junction House in said Washoe County, running thence northerly, crossing the Truckee river at what is known as Fuller's bridge,  * * *  for the period of ten years from and after the passage of this act, and the right of way over and along said route is hereby granted.        *        *        *        *        *·

" Sec. 2.    That it shall be the duty of said Myron Lake, his heirs and assigns, to construct with all reasonable dispatch, a good road, with substantial bridges and culverts, over and along said route, 'for the safe and speedy transportation of persons and property.        *        *        *        *        *        *

" Sec. 3.    That it shall be unlawful for any other person or persons to have, keep, maintain, or construct, over or across said river, at the point thereon above mentioned, or within one mile on either side thereof, any bridge, ferry, or other public means for the conveying across said river of either persons or property.

" Sec. 4.    That said Myron Lake, his heirs and assigns, shall be at liberty to charge and collect from persons traveling over and along said road such rates of toll as may be fixed."  .*  *  *
Stats. 1862, 19.

Now upon this basis appellant urges that for ten years from the date of the statute quoted, he has an exclusive franchise for the conveying, or furnishing the means of conveyance for persons and property across the Truckee River at the specified point, and for one mile on either side thereof, which should be protected in equity against infringement. It may be admitted that the remedy sought is the correct one for the alleged injury; that the grant is exclusive, and that to interfere with it by legislative action, would be to impair the obligation of a contract. *The Binghampton Bridge,* 3 Wallace, 51.

The sole question then in this case is of infringement. The facts pleaded and admitted are, that respondent is a legally incorporated company, under the general railroad law of this state, (Stats. 1864–5, 427) which gives among other privileges the right to construct the road " across, along, or upon, any stream of water, water-course," &c.; that it is engaged in building a railroad from Virginia City in Storey County, through Ormsby and Washoe Counties, to connect with the Central Pacific railroad at Reno in said Washoe County; that its entire route is surveyed, and its road built and in operation from Virginia City to Carson City; and that it was, at time of suit brought, engaged in building the road from the point of junction at Reno, toward Carson City; that such route crossed Truckee river, within a mile of appellant's bridge; that to cross such river what is known as a railroad bridge is necessary; that this is "intended to be nothing more than a railroad track, part of its said railroad, laid upon piers raised upon the bank and in the channel of said river, and properly supported to sustain said track, and is not intended to be in any way capable of being used for the passage of persons, animals or teams or property, except in and by the locomotive and railroad cars of this defendant, (respondent) run exclusively upon its said railroad, and will not be used in crossing persons or teams or property over said river, for compensation or toll, or otherwise than for the transportation of passengers and freight across said river, in and by the said locomotives and cars, and will not be used in any way to interfere with the privileges of the plaintiff (appellant) in respect of his said bridge and road, or for transporting over said river any other thing

than the said locomotives and cars of this defendant, (respondent) regularly run upon its said railroad in the ordinary course of its business "; " that the contemplated running of the defendant's (respondent's) cars over its railroad and bridge described in complaint and answer, will decrease the tolls on plaintiff's (appellant's) bridge in the sum of one dollar per·day and more; that plaintiff (appellant) has not, and never had any bridge across Truckee river, over which railroad cars or locomotives could run."

Upon these facts and the statute is to be decided the issue. The rule of construction of similar acts is so concisely stated by high authority in England, and these United States, that it may not be amiss to quote it.    " This, like many other cases, is a bargain between a company of adventurers and the public, the terms of which are expressed in the statute, and the rule of construction in all such cases is now fully established to be this—that any ambiguity in the terms of the contract must operate against the adventurers and in favor of the public; and the plaintiffs can claim nothing which is not clearly given to them by the act."    *Canal Co.* v. *Wheely,* 2 Barn & Ad. 792.

" But the rule of construction in cases of this description as recognized by this court in the case of the *Charles River Bridge* v. *The Warren Bridge,* 11 Pet. 420, is this : That any ambiguity in the terms of the grant must operate against the corporation and in favor of the public, and the corporation can claim nothing that is not clearly given by the law.   We do not mean to say that the charter is to receive a strained and unreasonable interpretation, contrary to the obvious intention of the grant.   It must be fairly examined and considered, and reasonably and justly expounded. But if upon such an examination there is doubt or ambiguity in its terms and the power claimed is not clearly given, it cannot be exercised.    The rights of the public are never presumed to be surrendered to a corporation unless the intention to surrender clearly appears in the law."    *Perrine* v. *Chesapeake & Del. Canal Co.,* 9 How. 180.

It would seem under the facts and the law, that there could be little doubt of the correctness of the order of the district court appealed from ; but as the opposite view is pressed with great energy,

and it is insisted that the authorities relied on by respondent are not in point, it may be well to examine the current of decision upon similar statutes in this country, and see whither it tends.

As early as 1837, it was held in New York, that if a grant had in terms given to a corporation the exclusive right of erecting a toll bridge across the river at Schenectady, a subsequent grant to a railroad company to cross the river with their railway, and to transport passengers thereon in the ordinary course of their business in the conveyance of travelers from one place to another, would not be an infringement of the privileges conferred by such prior grant; as the railroad bridge would not be a toll bridge, within the intent and meaning of the grant to the bridge company. *The Mohawk Bridge Co.* v. *The Utica and Schenectady R. R. Co.*, 6 Paige, 154. Appellant argues that the reason for the decision was that the legislature, in making the grant to the bridge company, could not have intended to prohibit a railroad bridge, as at that date such a structure was unknown; and that the reason failing in this case, the authority fails also; of that, further on.

The next case in New York seems to put the decision upon a broader ground. An injunction was denied to the Harlem Bridge company which claimed under an act, providing among other things " that it shall not be lawful for any person or persons whatsoever, to erect any other bridge over or across the Harlem river to Morrisania, or to keep any vessel to ferry any person across the river, from Morrisania to Harlem, except for the private use of the inhabitants of that township." A private bridge was built, which was afterward purchased by the railroad company; and it was held that such company had the right to use the same for all legitimate railroad purposes—the court saying: " It was argued on the part of the defendants that the railroad bridge used merely for its appropriate purpose of passing their locomotive engines and trains of cars across the Harlem river on their way from the City of New York to their various stopping places in Westchester county, does not violate, infringe or interfere with the franchise granted to the Harlem Bridge Company by the Act of 1790. There is undoubtedly much force in the argument. The railroad bridge as such is incapable of being used for the passage of any vehicle, animal, or

foot passenger, for whose passage the complainants are entitled to
receive toll.   The fact that the railroad bridge, as built for the
private use of the inhabitants of Morrisania, may be crossed by
such vehicles, &c., does not affect the consideration of this point.
On the other hand, the complainants' bridge has not the capacity to
pass over the Harlem river any of the railroad company's engines,
or their trains or cars drawn by such engines.   And if the com-
plainants were to lay down a suitable railway track, and strengthen
their bridge so that the engines and trains of the defendants might
cross it, there is nothing in their charter which would warrant them
in exacting toll from the defendants.   This demonstrates that
the franchise granted to the defendants is not the same as that
vested in the complainants; nor is there such a similarity between
them as renders one an interference with the other, in the sense in
which a new bridge or a ferry interferes with a prior one established
at the same point."   *Thompson* v. *The New York and Harlem R.
R. Co.*, 3 Sandf. Ch. 625.   See also *Akin* v. *Western R. R. Cor-
poration*, 20 N. Y. (6 Smith) 370.

In North Carolina, where a person held a ferry under the proviso
" that it should not be lawful for any person whatever, to keep any
ferry, build any bridge, or set any person or property over the river
for fee or reward, within six miles of the bridge," it was said by
the court:  " The broad question is, had the legislature power to
authorize the company to build a bridge across the northeast branch
of the Cape Fear river, in *continuation and as a part of* the rail-
road, charging for persons and property carried along the road,
and making no charge for persons or property set over the river as
an act of itself, *i. e.*, (making no separate charge for setting per-
sons or property over the river, and making no higher charge on
that part of the road by reason of the river) notwithstanding the
franchise claimed by the plaintiff under the act of the governor,
council and assembly of the colony of North Carolina, in the year
1766 " ?   This question was decided in the affirmative, upon the
ground that the intent of the parties must be deemed to be confined
to the means known and in use at the time of the contract; and
upon a further constitutional ground — the court saying:  " We are
not now to decide whether the ' franchise ' or ' monopoly ' granted

to Herron, his heirs and assigns, by the colonial government, was entirely abolished by the declaration of rights and the formation of the state government, or not.    It may be that the franchise still exists, so far as it confers a right to keep up a bridge and take toll, and possibly so far as to prevent any other person from 'setting any person or thing over the river in the way of a ferry or an ordinary bridge'; that is a different question; we decide now, that, notwithstanding the colonial act of 1766, the legislature in 1833 had the power to grant to the defendants a right to construct a railroad, and in doing so, to cross the south (north?) east branch of Cape Fear, and to consider 'the transit' over the river as a a part of the road."    *McKee* v. *Wil. & R. R. Road Co.*, 2 Jones' Law, (N. C.) 186.

In New Hampshire, it was incidentally, but apparently suggestively remarked, without any decision, none being called for in the then state of the case, and none being after reported.    "It is evident, that in order to determine the rights of parties, it may become necessary to inquire whether the bridge proposed to be erected by the respondents be a violation of the orator's charter, and the exclusive privileges conveyed thereby.    What kind of travel it is calculated to accommodate, how far the purposes it is designed to accomplish are the same with those intended by the orator's bridge, are matters which we may be called upon to examine.    And in this view it is by no means clear that we may not find it proper to consider the allegation that railway communications were not brought into use until after the grant to Hale.    Does a railroad bridge subserve the purpose for which the orator's bridge was erected?    They are both bridges, that is, both are structures of wood, iron and stone, crossing the river.    But, though generically the same, the specific difference between them may be very great; so great that one may not be considered as infringing upon the province of the other."    *Tucker* v. *The Cheshire R. R. Co.*, 21 N. H. 1 Foster, 29.

The digest has it that the Supreme Court of Georgia held, "That the franchise granted to the railroad company was not the same as that conferred on the first grantee, nor so similar as to be deemed an infringement upon the prior charter, in the sense in which a new

bridge or ferry interferes with one previously established at the same point; and that no injunction will be granted, or compensation decreed, by way of damage in such a case." This, upon facts stated as follows: " The legislature of 1806 authorized· Joseph Hill to erect a toll bridge across the Great Ogeechee, at a particular place; and the act provides that it shall not be lawful for any one to erect any other bridge within five miles above or below said bridge. The toll bridge was built, and had been kept up ever since. In 1847 and 1851, the legislature authorized the construction of a railway across the same river, between Savannah and Albany, which would necessarily cross near the said toll bridge, and which was actually carried across, within a mile and a half below the same." *McLeod* v. *S. A. & G. R. R. Co.*, 25 Ga. 445; Dig. 71, Tit. Bridges.

The report, unfortunately, is not in the library, but the quotation is probably correct, being in unison, so far as ascertained after a tolerably thorough research, with the decisions or intimations of all courts of last resort in this country in which the question has been mooted, save one.

The most carefully considered case in the books is that of *Bridge Co.* v. *Hoboken Land and Improvement Co.* This is first found in 2 Beasley N. J. Ch. 81, where the decision is by the chancellor, who holds that plaintiffs had, by contract with the state, the exclusive franchise of maintaining bridges and taking toll over certain rivers, and that such contract was within " the protection of the constitution, which declares that no law shall be passed impairing the obligation of contracts. But the construction of a viaduct over .said *river* (*sic*, meaning the Hackensack) for a railway, to be used exclusively for the passage of locomotives, engines, and railroad· cars, is not a *bridge* within the prohibition of said charter."

The decision of the chancellor was approved by the court of errors and appeals, (Ib. 503) and was finally reviewed and affirmed by the Supreme Court of the United States.

The several opinions are exhaustive of the subject, in its every phase, but somewhat too lengthy for quotation entire; and any more extended citation than will hereinafter be made is unnecessary, as the essence may be found in the few closing words of Mr. Justice

Miller, speaking for the court last named. "We are, however, satisfied that sound principle and the weight of authority are to be found on the side of the judgment rendered by the New Jersey court of errors and appeals in this case; and accordingly that judgment is affirmed." *Bridge Proprietors* v. *Hoboken Co.*, 1 Wall. 116.

Opposed to the cases hereinbefore cited, is that of the *Enfield Toll Bridge Company* v. *The Hartford and New Haven Railroad Co.*, 17 Conn. 40, which touches every point made in those cases, save that of the neglect or inability of the ordinary bridge proprietors to furnish the necessary facilities for railroad travel. The New Jersey court of errors and appeals criticises this last named case almost unmercifully; but whether the criticism be just or not, still this one decision could not be allowed to override all the others, unless it be so evidently correct as to make it necessary to take an absolutely new departure upon a question which may properly be considered to have been settled for more than thirty years in the United States.

So far as the cases go upon the reason that legislatures could not have intended to bar railroad bridges, or other means adapted to steam travel over water-courses, because such travel was unknown at the date when the grants or contracts were made, a stronger argument arises upon grant or contract of present date; for it could not be held, except upon clearest legislative expression, that in the very age of steam a legislature would have made a grant or contract so utterly opposed to public policy and the march of improvement as that to appellant, if interpreted as he desires. This view forces itself, when a glance at the territorial statutes shows, in 1861, railroad grants, with power to build over any stream, when necessary, with similar legislation in 1862, while the same volumes teem with grants, some exclusive in terms, some not; one, at least, in the exact language of Lake's act, for ferries, toll roads and bridges, over some if not all of the very streams which railroads had been allowed to cross by cotemporaneous statutes.

Now, shall the legislature be convicted of utter recklessness and chronic stupidity; or shall the more natural inference arise, that it was granting these toll road, bridge and ferry franchises, with the

laudable intent of improving the territory, and giving railroad companies privileges, with the same view ?—regarding the one as so entirely distinct from the other, that no confusion could arise.

The legislature in 1861 authorized the Central Pacific railroad " to cross, intersect, join and unite its railroad with any other railroad, either before or after constructed, at any point upon its route." Was the passage of appellant's grant a repeal of this privilege, which was further extended two days after such passage? The Central Pacific is connected with respondent; the object of the legislation, continuous and lengthened line of road, is then accomplished. Shall that result be destroyed by appellant's franchise, or shall it be so hampered that compensation must be made prior to its enjoyment? Certainly, if the legislative intent be so clear as to warrant such course. Such intention must first be attempted to be gathered from the language, which bestows or agrees upon the franchise. Precisely what that franchise is, the language used defines as the right " to charge and collect from persons traveling over and along said road such rates of toll," &c.

That is the franchise, pure and simple. With that respondent certainly does not interfere, so far as its precise terms go; and the undisputed rule is that nothing is to be inferred in favor of such grants. The language of exclusion found in Section 3, must be construed with regard to the franchise granted, for that is the thing to be protected; and hence, it would only be unlawful to convey persons and property across the river, to the extent that such acts interfered with the collection of tolls from " persons traveling *over and along* said road." But to take a broader view, and admit that from necessary implication it was intended to give Lake a monopoly of passing for hire, persons and property across the river, at and within a mile on either side of the point specified. Yet every word of the act points to such travel as would come by a road, and by ordinary means of locomotion; and it is in this light that respondent's doings must be tested.

If it has built a bridge by which the public, moving in any ordinary manner, can cross the river, or established a ferry for like use, or offers any other imaginable means by which such purpose can be accomplished, by ordinary and usual locomotion, then it has

infringed upon appellant's rights.  As has been stated, such is not the fact.  No foot passenger, no man on horseback, no carriage, large or small, save one adapted to run on rails and over a road-bed of the exact gauge of respondent's, can pass the river by the means offered.  Even the public traveling in the last mentioned vehicle are excluded, unless they choose to go in one belonging to and provided by respondent.  The public, as such designation is made in the statute, are not served.

In the cases quoted, this is the idea underlying.  In the New Jersey case much space is devoted to proving that a railroad via-duct is not a bridge, either in ancient or modern sense ; but the argument really turns upon the proposition that it is not so, be-cause not what the public can or do use as a bridge, or other means of crossing a stream.  Says the chancellor, (2 Beas. 93) :  " The bridges are declared to be a public highway, free for all citizens to pass over on paying the accustomed toll.  But the bridges are free only to those traveling by usual and known methods upon the public highway.  They are not free to the great mass of the traveling public.  The great torrent of railroad travel must seek another channel.  The complainants are neither required nor al-lowed to accommodate it.  Aside from the restrictions which have been imposed upon them by the terms of their contract and by legislative enactment, they never could have supposed that they were required to furnish facilities for a railway, or for locomotives and trains of cars, to cross the bridges.  It was not within the scope of their contract.  If the bridge proprietors were not bound to accommodate the railway traffic, were the legislature restrained by the terms of the grant for providing facilities for railroad travel ?"

Appellant's grant requires, as a condition for its use, a duty, which is, " to construct, with all reasonable dispatch, a good road, with substantial bridges and culverts, over and along said route, (from the Junction House in Washoe County to the boundary line between that county and Lake) for the safe and speedy transpor-tation of persons and property, and keep the same in good repair and condition at all times."  No fair interpretation of that lan-guage can fix upon Lake the burden of providing for the safe and

speedy transportation of persons and property coming in railroad cars drawn by a locomotive, nor the building bridges and culverts, or either, sufficiently substantial to uphold such means of locomotion.   Then it cannot properly be claimed, that appellant, though not bound to furnish the means of accommodating the class of travel suggested, yet may prevent others from so doing either absolutely or contingently.   That would be to destroy the mutuality of the contract.

To quote once more from the chancellor.  " Again, the complainants' franchise consists in the right of taking toll for crossing the river.  (A stronger case upon the language of grant than the one at bar.)   But the defendants' structure is not a toll bridge. They have no franchise of taking tolls.   They have no right to charge for crossing the river, any more than if it were not in existence.   The structure which they are erecting is not a mere connection between the opposite shores—it is part of an extended line of railway, connecting distant points, over which the defendants are to transport passengers at a stipulated rate.   Nor is it a *free* bridge, by which parties may evade paying toll upon the complainants' bridge, to the prejudice of their franchise.   Its character and purpose are in fact essentially different from that of a bridge used merely as a connecting link for the transfer of passengers between the opposite shores of a river."   2 Beas. 94.

So here, the respondent's structure is neither a bridge, a ferry, nor any public means of crossing the river, by any ordinary method of travel ; and if any other had been contemplated by the legislature, it should have been, and the legal conclusion is that it would have been, expressed.   Nor is it any means of crossing the river save as incidental to the general route of the respondent's railroad. In the same case on appeal, in summing up, Justice Vredenburgh says: " I am of the opinion—first, that the proposed structure of the defendants is no bridge of any kind whatever, as the term bridge is used in the charter of 1790 ; and secondly, that if it were such bridge, the franchises given to the defendants by the act of 1860, are entirely different franchises from those given to the complainants in their charter of 1790 ; that the railway franchise given by the act of 1860 to the defendants is no more a bridge

franchise than it would be a steam ferry franchise, a canal franchise, or a telegraph franchise." 2 Beas. 541. It is in fact something of its own kind ; not to be likened to anything else, and so peculiar, and so prominently before the public eye at the date of appellant's grant, that not to name it expressly is to ignore it utterly, as forming one of the public means of crossing Truckee river, referred to therein. There was in the case last cited an assumed element of strength on the side of complainants, which does not exist as to appellant here. There it was claimed, that the legislature in granting the railroad franchise had expressly and in terms recognized the franchise of complainants, and required the railroad corporation to pay for it ; but the court said, that such recognition was only of the franchise as it existed, not as it was claimed. So here, if the appellant's real franchise has been infringed, equity should stay the respondent, until compensation made ; but it is only in case of the infringement of an actual express right, not one claimed or implied, that equity will interpose in this or similar cases. As to this case, from whatever legal stand-point it be studied, the inevitable conclusion reached cannot be better expressed than in the language of Chancellor Green. * * * "The structure of the defendant's is not designed as an evasion of, or fraud upon, the rights of the complainants (appellants). It is not an attempt to carry passengers across the river, either free or for toll, in evasion of the complainants' (appellant's) franchise. The avowed purpose is to construct and complete a continuous line of road from Newark to Hoboken, (Virginia City to Reno) and to transport passengers over the entire route. The diversion of travel from complainants' (appellant's) bridge, and the consequent loss of tolls, is an incidental consequence of opening a new route of travel, of which the complainants' have (appellant has) no legal right to complain." 2 Beas. 96.

It follows that the order of the district court was correct and should be affirmed.

It is so ordered.

By Garber, J.: I dissent.