68 U.S. 116 (1863)
1 Wall. 116
THE BRIDGE PROPRIETORS
v.
THE HOBOKEN COMPANY.
Supreme Court of United States.

*125 Mr. Bradley and Mr. Gilchrist for the Hoboken Company.
Mr. Zabriskie for the Bridge Proprietors.
*141 Mr. Justice MILLER delivered the opinion of the court:
The first point arising in the case is that which relates to the jurisdiction of this court to review the decision of the State court of New Jersey. This is a question which this court has always looked into in this class of cases, whether the point be raised by counsel or not; but here it is much pressed, and we proceed to examine it.
It is asserted by the plaintiffs in error, that the validity of the act of the New Jersey legislature of 1860, is drawn in question as being contrary to that provision of the Constitution of the United States, which declares that no State shall pass any law impairing the obligation of a contract; and that the decision of the State court was in favor of its validity, and the case is therefore embraced by the 25th section of the Judiciary Act.
*142 It is objected, however, by the defendants, that the pleadings do not, in words, say that the statute is void because it conflicts with the Constitution of the United States, and do not point out the special clause of the Constitution supposed to render the act invalid.
It would be a new rule of pleading, and one altogether superfluous, to require a party to set out specially the provision of the Constitution of the United States, on which he relies for the action of the court in the protection of his rights. If the courts of this country, and especially this court, can be supposed to take judicial notice of anything without pleading it specially, it is the Constitution of the United States. And if the plaintiff and defendant in their pleadings, make a case which necessarily comes within some of the provisions of that instrument, this court surely can recognize the fact without requiring the pleader to say in words: "This paragraph of the Constitution is the one involved in this case."
Very few questions have been as often before this court, as those which relate to the circumstances under which it will review the decision of the State courts; and the very objection now raised by defendants has more than once been considered and decided.
In the case of Crowell v. Randell,[*] the motion to dismiss for want of jurisdiction was argued at much length by Mr. Webster, Mr. Sergeant, and Mr. Clayton, whose names are a sufficient guarantee that the matter was well considered. The opinion was delivered by Mr. Justice Story. He reviews all the cases reported up to that time, and lays down these four propositions as necessary to bring a case within the 25th section of the Judiciary Act.
"1st. That some one of the questions stated in that section did arise in the State court. 2d. That the question was decided by the State court, as required in the same section. 3d. That it is not necessary that the question should appear on the record to have been raised and the decision made in direct and positive terms, ipsissimis verbis, but that it is sufficient *143 if it appears, by clear and necessary intendment, that the question must have been raised and must have been decided, in order to have induced the judgment. 4th. That it is not sufficient to show that the question might have arisen or been applicable to the case, unless it is further shown in the record that it did arise, and was applied by the State court to the case."
In the case of Armstrong v. The Treasurer of Athens County,[*] Judge Catron, in delivering the opinion of the court, said that the question of jurisdiction under the 25th section of the act of 1789, had so often arisen, and parties had been subject to so much unnecessary expense, that the court thought it a fit occasion to state the principles on which it acted in such cases. Referring especially to the manner in which the question on which the jurisdiction must rest shall be made to appear, he lays down six different modes in which that may be done. The first of these is "either by express averment or by necessary intendment in the pleadings in the case." The sixth is, "that it must appear from the record that the question was necessarily involved in the decision, and that the State court could not have given the judgment or decree which they passed, without deciding it."
Now, although there are other decisions in which it is said that the point raised must appear on the record, and that the particular act of Congress, or part of the Constitution supposed to be infringed by the State law, ought to be pointed out, it has never been held that this should be done in express words. But the true and rational rule is, that the court must be able to see clearly, from the whole record, that a certain provision of the Constitution or act of Congress was relied on by the party who brings the writ of error, and that the right thus claimed by him was denied.
Looking at the record before us, and applying to it these principles, we find no difficulty in the matter. The defendants claim, under the act of 1860 of the New Jersey legislature, a right to build their railroad bridge, or viaduct, over the Hackensack *144 River, inside the limits prohibited by the act of 1790. The plaintiffs say, that to permit this is to violate the contract which they have with the State of New Jersey, and therefore the act of 1860, so far as it confers such authority on the defendants, is made void by the Constitution of the United States, because it impairs the obligation of a contract. The State court dismissed the bill on these pleadings alone. It could not have done this, without holding the act of 1860 to be valid, as it was the only authority on which defendants rested their right to build any structure whatever over the Hackensack River. In holding that act to be valid, notwithstanding plaintiffs claim that it was void as impairing the obligation of their contract with the State of New Jersey, a decision was made within the very terms of the 25th section of the act of Congress of 1789.
It is said, however, that it is not the validity of the act of 1860 which is complained of by plaintiffs, but the construction placed upon that act by the State court. If this construction is one which violates the plaintiffs' contract, and is the one on which the defendants are acting, it is clear that the plaintiffs have no relief except in this court, and that this court will not be discharging its duty to see that no State legislature shall pass a law impairing the obligation of a contract, unless it takes jurisdiction of such cases.
The case of the Commercial Bank v. Buckingham's Executors,[*] does not conflict with this view, because that was a case in which the prior and the subsequent statutes were both admitted to be valid under any construction of them, and therefore no construction placed by the State court on either of them, could draw in question its validity, as being repugnant to the Constitution of the United States, or any act of Congress.
But there is a misconception as to what was construed in this case by the State court. It is very obvious that the statute of 1860 was not construed. No doubt is entertained by this court, none could have been entertained by the State *145 court, that it was intended by the framers of that act to authorize the defendants to build the railroad bridge which they were building, and which plaintiffs sought to enjoin. The act which was really the subject of construction, was the act of 1790, under which plaintiffs claim. For if that act and the proceedings under it amounted to a contract, and that contract prohibited the kind of structure which the defendants were about to erect under the act of 1860, then the latter act must be void as impairing that contract. If on the other hand the first act and the agreement under it was not a contract, or if being a contract it did not prohibit the erection of such a structure as that authorized by the act of 1860, the latter act was valid, because it did not impair the obligation of a contract. It was then the act of 1790 which required construction, and not that of 1860, in order to determine whether the latter was valid or invalid.
In the case of the Jefferson Branch Bank v. Skelly,[*] this court says: "Of what use would the appellate power of this court be to the litigant who feels himself aggrieved by some particular State legislation, if this court could not decide independently of all adjudication by the Supreme Court of a State, whether or not the instrument in controversy was expressive of a contract and within the protection of the Constitution of the United States, and that its obligation should be enforced notwithstanding a contrary conclusion by the Supreme Court of a State? It never was intended, and cannot be sustained by any course of reasoning, that this court should or could, with fidelity to the Constitution of the United States, follow the Supreme Court of a State in such matters, when it entertains a different opinion."
We are therefore of opinion, that the record before us presents a case for the revisory power of this court over the State courts, under the 25th section of the act of Congress of 1789.
Approaching the merits of the case, the first question that presents itself for solution, is whether the act of 1790, and the agreement made under it by the commissioners with the *146 bridge builders, constitute a contract that no bridge shall be built within the designated limits, but the two which that statute authorized. This we think to be so very clear as not to need argument or illustration. The parties who built the bridges had the positive enactment of the legislature, in the very statute which authorized the contract with them, that no other bridge should be built. They had a grant of tolls on their bridges for ninety-nine years, and the prohibition against the erection of other bridges was the necessary and only means of securing to them the monopoly of those tolls. Without this, they would not have invested their money in building the bridges, which were then much needed, and which could not have been built without some such security for a permanent and sufficient return for the capital so expended. On the faith of this enactment they invested the money necessary to erect the bridges. These acts and promises, on the one side and the other, are wanting in no element necessary to constitute a contract. Such legislative provisions of the States have so often been held to be contracts, that a reference to authorities is superfluous.
We are next led, in the natural order of the investigation, to inquire if the contract of the State forbid the erection of such a structure as the defendants were authorized to erect, and which they proposed to erect, under the act of 1860.
This question, upon the decision of which the whole case must turn, we approach with some degree of hesitation. It is now over seventy years since the contract was made. A period of time equal to three generations of the human race has elapsed. During that time the progress of the world in arts and sciences has been rapid. In no department of human enterprise have more radical changes been made, than in that which relates to the means of transportation of persons and property from one point to another, including the means of crossing water-courses, large and small. The application of steam to these purposes, on water and on land, has produced a total revolution in the modes in which men and property are carried from one place to another. Perhaps the most remarkable invention of modern times, in the influence *147 which it has had, and is yet to have, on the affairs of the world, as well as in its total change of all the elements on which land transportation formerly depended, is the railroad system. It is not strange, then, that when we are called to construe a statute relating to this class of subjects, passed before a steam engine or a railroad was thought of, in its application to this modern system, we should be met by difficulties of the gravest character.
On the one hand, we are told that the structure about to be erected by defendants is a bridge: simply that, and nothing more or less; that such is the name by which it is now called, and that it is, therefore, within the literal terms of the act; and that it performs the functions of a bridge, and is, therefore, within the spirit of the act. On the other hand, it is denied that the structure is a bridge, even in the modern sense of that word, since it is urged that the word is never applied to such a structure, without the use of the word railroad, prefixed or implied; and that it performs none of the functions of a real bridge, as that term was understood in the year 1790.
In all the departments of knowledge, it has been a constant source of perplexity to those who have attempted to reduce discoveries and inventions to scientific rules and classifications, that old terms, with well-defined meanings, have been applied so often to things totally new, either in their essence or in their combination. It is to avoid the danger of being misled by the use of a term well understood before, but which is a very poor representative of the new idea desired to be conveyed, that our modern science is enriched with so many terms, compounded of Greek and Latin words, or parts of words. It does not follow, that when a newly invented or discovered thing is called by some familiar word, which comes nearest to expressing the new idea, that the thing so styled is really the thing formerly meant by the familiar word. Matters most intimately connected with the immediate subject of our discussion may well illustrate this. The track on which the steam-cars now transport the traveller or his property is called a road, sometimes, perhaps generally, *148 a railroad. The term road is applied to it, no doubt, because in some sense it is used for the same purpose that roads had been used. But until the thing was made and seen, no imagination, even the most fertile, could have pictured it, from any previous use of the word road. So we call the inclosure in which passengers travel on a railroad, a coach; but it is more like a house than a coach, and is less like a coach than are several other vehicles which are rarely if ever called coaches. It does not, therefore, follow, that when a word was used in a statute or a contract seventy years since, that it must be held to include everything to which the same word is applied at the present day. For instance, if a Philadelphia manufacturer had agreed with a company, seventy years ago, to furnish all the coaches which might be necessary to transport passengers between that city and Baltimore for a hundred years, would he now be required by his contract to build railroad coaches? Or, if a company had then contracted with the Government to build and keep up good and sufficient roads, to accommodate mails and passengers between those points, for the same time, would that company be bound to build railroads under that contract? Yet the structure which the defendants propose to build over the Hackensack is not more like a bridge of the olden time than a railroad is like one of its roads, or a railroad coach is like one of its coaches. It is not, then, a necessary inference, that because the word bridge may now be applied by common usage to the structure of the defendants, that it was therefore the thing intended by the act of 1790.
Let us see what kind of structure the defendants proposed to build.
It is an extension of the iron rails, which compose the material part of their road, over the Hackensack River, together with such substructure as is necessary to keep them in place, and enable them to support the cars which cross on them. There is no planked bottom, no roadway or path, nothing on which man, or beast, or vehicle can pass, save as it is carried over in the cars of the defendants. Was this *149 kind of thing in the minds of the framers of the act of 1790, or of the commissioners who let the contract? Or would the term bridge as then used by them, or by common usage, have included such a thing? We have no hesitation in answering both these questions in the negative. We are therefore quite clear that the adoption of that word to express the modern invention, does not bring it within the terms of the act, if it is not within the intent of it. We will inquire, therefore, a moment, if it is within the spirit of the act, and the accompanying contract with the commissioners.
There is no doubt that it was the intention of those who framed those two documents, to confer on the persons now represented by the plaintiffs, some exclusive privilege for ninety-nine years. If we can arrive at a clear and precise idea what that privilege is, we shall perhaps be enabled to decide whether the erection proposed by defendants will infringe it.
In the first place it is not an exclusive right to transport passengers and property over the Hackensack and Passaic Rivers, within the prescribed limits, for there is no prohibition of ferries, nor is it pretended that they would violate the contract. In the next place, it is not a monopoly of the right to build bridges within the prescribed limits, because they were only authorized to build one bridge over each river, and the statute enacted expressly, that it was unlawful to build any other bridge, by any person or persons, without excepting them. Besides, the building of a bridge was not the privilege, but the duty, of those who had the contract; a duty which constituted the consideration for the privilege which was granted to them.
The right to collect toll of persons and things passing over their bridges, is the privilege or franchise which they have, and that right is rendered valuable by the prohibition to build other bridges within the limits designated. This prohibition of other bridges is so far a part of the contract, and only so far, as it is necessary to enable plaintiffs to reap the benefit of their right to collect toll for the use of their bridges. The *150 extent to which tolls may be levied by the bridge owners, and the classes of persons and things on which they may be levied, are enumerated distinctly, and fixed by the contract. They may be summed up shortly, as persons on foot, animals, and vehicles, passing over the bridges. If the proposed structure is essentially calculated to interfere with, or impair the right of plaintiffs to collect these tolls, we are unable to see it. No animal can pass over it on foot. No vehicle which can pass over the bridge of plaintiffs can by any possibility pass over that of defendants. No class of persons, or things, of which plaintiffs can exact toll, can evade that toll by using the structure of defendants.
It may be said, that passengers and property now transported by that railroad, would be compelled to use the bridge of plaintiffs, if there were no such road and no such viaduct. This might be true to a very limited extent, if plaintiffs could annihilate all railroads running in the direction of the road which passes over their bridge. But this they cannot do. And, as to the road of the defendants, if they are not permitted to pass the Hackensack within the limits claimed by plaintiffs, they can with more expense cross it somewhere else. That being done, it is not believed that the number of passengers, or the amount of freight carried in wagons which would cross on the bridges of plaintiffs, in consequence of this change in the location of the railroad viaduct, is appreciable.
As the plaintiffs have no right to build any more bridges, and as the viaduct of defendants does not impair that which is really their exclusive franchise, we do not perceive how the law which authorizes such a structure can impair the obligation of the contract, made in 1790, by the State, with the bridge owners.
These views are not without the support of adjudged cases, which, if not in all respects precisely such as the one before us, are sufficiently so to show that they were considered, and entered largely into the reasoning upon which the judgments of the courts were founded.
In the Mohawk Bridge Company v. The Utica and Scheneciady *151 Railroad Company, the plaintiffs claimed an exclusive franchise, similar to that held by plaintiffs in this case, which the defendants, as they alleged, were about to violate by erecting a structure for the use of the railroad, over the same stream, within the prescribed limits. The chancellor refused the injunction upon the ground that the grant to plaintiffs was not exclusive, which was at that time a very doubtful question in New York; and also upon the ground that the exclusive right to the toll-bridge would not be infringed by the erection of a railroad bridge, within the limits over which the exclusive right extended.
In the case of Thompson v. The New York and Harlem Railroad Company,[] where the contest was again between a bridge owner, claiming exclusive rights, and a railroad company seeking to cross the stream within the bounds of plaintiff's claim, the assistant vice-chancellor refers to the case above mentioned, and says that he refuses the relief on both the grounds therein mentioned.
The case of McRee v. The Wilmington and Raleigh Railroad Company,[] was an action at law, by the owner of a bridge, who set up an exclusive franchise, against a railroad company whose track crossed the stream within the limits of his franchise, for a penalty allowed by statute for any violation of his right of toll. It is true, that the court rests its decision mainly on the ground, that by the bill of rights of the State of North Carolina, no such monopoly as that claimed by plaintiff can exist. But they argue very forcibly, that a railroad bridge is no violation of a franchise for an ordinary toll-bridge, and intimate strongly that they would so hold if the case required the decision of the point.
The case of the Enfield Toll-Bridge Company v. The Hartford and New Haven Railroad Company,[§] has been cited by counsel and much relied on, as deciding the principle in question the other way. And perhaps a fair consideration of the case, and the line of argument of the learned judge who delivered the opinion, justifies counsel in claiming that *152 it is in conflict with the views we have here expressed. In that case, however, it was found by special verdict, as one of the facts on which the action of the court was asked, that the defendants' road and bridge would, to a certain extent, diminish the tolls of plaintiff; a fact which is not found in the case before us, and which, as we have already shown, we cannot infer from its record. What influence this fact may have had in the minds of that court we cannot say. We are, however, satisfied that sound principle and the weight of authority are to be found on the side of the judgment rendered by the New Jersey Court of Errors and Appeals in this case; and accordingly that
JUDGMENT IS AFFIRMED.
Mr. Justice CATRON, after stating the case:
1st. I think this court has jurisdiction. In the court below the question was, whether the monopoly granted to the turnpike company bound the State not to allow another bridge to be built within certain limits? Such is the claim of the bill. The State court held that the contract claimed to have secured the monopoly was not violated. The contract was construed, and the correctness of that construction we are called on to examine.
2d. The State contracted with the turnpike company not to grant to others the privilege of erecting another bridge within the limits covered by the monopoly; and the contract was violated, if the railroad bridge would be a structure within the meaning of the charter of the turnpike company. The main question presented is, whether the legislature of New Jersey has the power to convey by contract, binding their successors (for ninety-nine years, or forever) not to exercise the sovereign right of improving the State by additional roads and bridges? If so, then the left bank of the Delaware and the right bank of the Hudson could be granted by an irrevocable contract, whose obligation was beyond the reach of future legislation.
3d. That the bridge being erected by the railroad company is within the meaning of the grant to the turnpike *153 company, and violates it, is to my mind free from doubt. The object was to confer a monopoly of crossing the river by the turnpike bridge only, and that this railroad bridge can, and probably will, engross the carrying of passengers and freight, to the injury and probable ruin of the value of the turnpike bridge, is evident. The legislature, in the railroad charter, has made careful provision that just compensation shall be made for private property taken for the purposes of the road; and as the bridge and abutments are part of the road, it is assumed by the railroad company that the contract set up by the bill can be compensated in money. If the turnpike bridge had been taken by the railroad company, then it is conceded that a right to compensate existed. But the difficulty of dealing with a sovereign right as private property, which is claimed by the old corporation, presents the difficulty lying at the foundation of this controversy. Here are the proprietors of the land on each side of the river, whose right to just compensation is not open to controversy, if their lands are taken; their claim is for private property, and the land is taken by the sovereign right claimed by the turnpike company. It can only come in to be compensated for public property, which the eminent domain clearly is. For the private property taken on either bank of the river, underlying the eminent domain, the new company has already paid. But, for this public sovereign right no second compensation is provided by any constitution; it is only in cases of "private property taken for public use," that just compensation is secured to the owner.
If, however, I am in error in this assumption, then there is a provision, plain and simple, in the railroad charter, securing compensation, which obviates all objection to the erection of the railroad bridge, and on this ground I think it very clear that the bill was properly dismissed.
Mr. Justice GRIER, dissenting:
I do not concur in the opinion just read by my brother Miller; not that I question the correctness of the judgment of the Court of Appeals of New Jersey; but this court by *154 affirming their judgment as to the true construction of the act of 1790, have demonstrated that they have no jurisdiction of the case.
The act of 1860, it is clear, is not repugnant to the Constitution or laws of the United States. The proposition that one legislature can restrain the power of future legislatures from erecting a bridge for ninety (and if ninety, a thousand) years, for a distance of ten miles (and if ten, a hundred), will hardly be asserted by any one.
That a State may, in its exercise of eminent domain, condemn a franchise as it might lands, cannot now be disputed.
Now, the act of 1860 protects carefully all the rights of the defendants under the act of 1790, and requires compensation to be made them if they are injured.[*]
The complaint is not that the legislature have passed any act impairing the obligation of the contract, but that the courts of New Jersey have misconstrued the act of 1790, which gives them their franchise. Now, it cannot be pretended that the validity of this act is drawn in question on the ground of repugnancy to the Constitution. Their own courts have decided that a railroad viaduct is not a "bridge," and the aim of the plaintiffs in error, by this writ of error, is to have this court to give a different construction to their charter. If, besides, the plain words and intention of the act of Congress conferring jurisdiction on this court under the 25th section, a decision of this point were necessary to demonstrate the unwarranted assumption of jurisdiction in this case, it will be found in the unanimous opinion of this court in Commercial Bank of Cincinnati v. Buckingham.[] That case was decided after very full argument by able counsel. It was the unanimous judgment of this court. It is precisely in point, and it may be said in this case as in that, "If this court were to assume jurisdiction of this case, it is evident that the question submitted for our decision would be, not whether the statute of Ohio is repugnant to the Constitution of the United States, but whether the Supreme *155 Court of that State has erred in its construction of it. It is the peculiar province and privilege of the State courts to construe their own statutes, and it is no part of the functions of this court to review their decisions, or assume jurisdiction over them on the pretence that their judgments have impaired the obligation of contracts."
I therefore protest against this decision of the court as usurpation of jurisdiction not given to us by the Constitution or the acts of Congress. It disregards the plain words of the statute and the unanimous ruling of this court. If it be received as a precedent, it will draw to the examination of this court the construction of every act of incorporation or grant of a franchise by a State legislature. The clause of the Constitution which forbids a State to pass any act impairing the obligation of contracts will have to be construed as a general power given to the courts of the United States to restrain the courts of a State from making mistakes in the construction of their own statutes.
The opinion of my brethren of the majority, in order to sustain this assumption of jurisdiction, takes it for granted that, as a franchise is a contract, a State, in the exercise of its right of eminent domain, cannot condemn a franchise by paying its value, as well as the land of an individual. This is directly contrary to frequent decisions of this court. Yet such is the act of 1860. As I have said, it carefully saves the rights of plaintiffs, and directs compensation to be made in case of any injury to the same. I cannot give my assent to a decision founded on such an assumption, or which may hereafter be quoted to establish such a doctrine.
NOTES
[*] 16 Peters, 281.
[*] 5 Howard, 317.
[*] 1 Black, 436.
[*] 6 Paige, 564.
[] 3 Sanford, 625.
[] 2 Jones Law, 186.
[§] 17 Connecticut, 56
[*] See ante, p. 119; note. REP.
[] 5 Howard, 342.