## MOBILE GAS CO. v. PATTERSON et al.

(District Court, M. D. Alabama, N. D. at Montgomery. June 4, 1923.)

1. **Constitutional law** ⬅️135—**Valuation of property of gas company by Public Service Commission held not to create contract impaired by revaluation.**

Under Public Utility Act Ala. Oct. 1, 1920, giving the Public Service Commission power to fix rates for public utilities, and providing that it shall, after investigation, fix a valuation on the property of a utility which shall for all future rate-making purposes be the permanent basic valuation, and which valuation, if made at the request of a utility, shall be at its expense, such a valuation, made at the request of a gas company and for which it paid, *held* not to create a contract between the company and the state, which was impaired by an amendatory act authorizing a revaluation.

2. **Public service commissions** ⬅️7—**Authority to make contracts as to rates not to be implied.**

Authority of a Public Service Commission to make contracts with public utilities as to rates, not expressly given by statute, will not be implied from the fact that the expense incident to valuation of its property is required to be borne by the utility.

*(Per Clayton, District Judge, dissenting in part.)*

3. **Constitutional law** ⬅️135—**Valuation of property of gas company by Public Service Commission creates contract with state as to its value.**

Under Public Utility Act Ala. Oct. 1, 1920, the valuation by the Public Service Commission of the property of a gas company at its request and at its expense constitutes a contract with the state that it shall be the permanent basic valuation of the property in its then condition for all future rate-making purposes, but this does not exclude the commission, in making future rates, from taking into consideration any change in the value of the property due to deterioration, or to improvements or extensions.

⬅️For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

**4. Searches and seizures ☞7—Second examination of books and records of corporation held "unreasonable search."**

Where a state Public Service Commission had examined the books and records of a gas company for the purpose of making a valuation of its property, to require the company to produce its books and records for a second examination within a few months thereafter, for the purpose of a revaluation, *held* an "unreasonable search," in violation of Const. Ala. 1901, art. 1, § 5.

In Equity. Suit by the Mobile Gas Company against Andrew G. Patterson and others, individually and as members of the Alabama Public Service Commission. On supplemental bill for injunction. Granted.

See, also, 288 Fed. 884; 288 Fed. 890.

Harry T. Smith & Caffey, of Mobile, Ala., for plaintiff.

Harwell G. Davis, Atty. Gen. of Alabama, Hugh White, Asst. Atty. Gen. of Alabama, and Frank J. Yerger, of Mobile, Ala., for defendants.

Before WALKER and BRYAN, Circuit Judges, and CLAYTON, District Judge.

BRYAN, Circuit Judge. The Alabama Public Utility Act, approved October 1, 1920 (Gen. & Loc. Laws Sp. Sess. 1920, p. 38), provides for the supervision, inspection, and regulation by the Alabama Public Service Commission of the construction, maintenance, and operation of public utilities, including gas companies, of the rates charged by them, and of their valuation, financing, and issuance of securities. Section 14 empowers the commission, after investigation, to fix the valuation upon the property of such utilities. Section 16 provides that the valuation so fixed shall become final, and "for all future rate-making purposes be the permanent basic valuation of the property of such utility." Section 47 authorizes the commission to require the production of books, records, and accounts, and authorizes an examination thereof by the commission. The valuation provided for may be made upon the application of a utility, and when so made the utility is required to bear the expense.

Pursuant to the provisions of this statute, the Mobile Gas Company, the plaintiff, demanded a valuation of its property, and on February 14, 1922, the commission, after investigation, entered an order fixing such valuation at $1,969,565, and the gas company paid the expenses incident to the investigation, amounting to $2,200. Within the 30 days provided by the statute the gas company filed a protest against the valuation, and a hearing was held by the commission March 22, 1922. At that hearing the gas company withdrew its protest, but a rehearing was asked and granted on behalf of the city of Mobile, and upon such rehearing the commission, by an order dated July 24, fixed a valuation of $1,700,000 upon the property of the gas company. The commission thereupon fixed rates which were attacked by the gas company as confiscatory, and which formed the basis of the main suit filed shortly thereafter, in which an interlocutory injunction has heretofore been issued. The issues raised in that suit are as yet undetermined.

☞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

Sections 15, 16, and 47 of the Public Utility Act were amended by an act of the Legislature, approved February 13, 1923. The amendment provides for a single revaluation of the property of a public utility, which thereafter, for all future rate-making purposes, shall be the permanent basic valuation. Section 47 was amended so as to continue, and in some respects to broaden, the power of the commission to require the production of, and to examine, books, records, and accounts. April 16, 1923, the commission canceled and revoked the valuation of July 24, 1922, as well as the rates thereby fixed, and by a separate order of the same date required a revaluation in pursuance of the amendment of February 13, 1923.

Thereupon the gas company filed its supplemental bill, seeking to enjoin the commission from making a revaluation, upon the ground that the act of 1923, which purports to authorize it, is unconstitutional, as impairing the obligation of a contract. The bill avers that the commission caused the company's books and records to be thoroughly and exhaustively examined upon the company's application for a valuation, and just prior to the entry of the commission's order of July 24, 1922, and also seeks to enjoin another examination of the company's records at this time, upon the ground that it would constitute an unreasonable search in violation of the Fourth Amendment.

[1, 2] An application was recently made by the commission in the main suit for an order requiring the company to submit its records for examination by the commission, and in an opinion upon that application it was stated incidentally that to permit a revaluation would be to authorize the commission to impair the obligation of a contract in violation of the federal Constitution. However, upon further consideration of the Public Utility Act, we are of opinion that a contract between the state and the gas company did not result from the valuation of the company's property at its expense. The title of the act authorizes the commission to supervise, inspect, and regulate public utilities, for the purposes of fixing rates and of safeguarding the issuance of securities. Neither in the title nor in the text of the act is the purpose disclosed of authorizing the commission to enter into contracts as to rates with public utilities. Authority to make contracts, not being expressly granted, will not be implied from the circumstance that the expenses incident to valuation are required to be borne by the public utility. Milwaukee Electric Railway & Light Co. v. Wisconsin Railroad Commission, 238 U. S. 174, 35 Sup. Ct. 820, 59 L. Ed. 1254; San Antonio v. San Antonio Public Service Commission, 255 U. S. 547, 41 Sup. Ct. 428, 65 L. Ed. 777. Such expenses are incurred in order to enable the commission to pass intelligently upon the issuance of securities by a public utility, as well as to enable it to make a proper valuation, so as to determine upon just and reasonable rates, and in no proper sense can they be considered as consideration for a contract by the commission upon the subject of rates. The provisions for valuation appear to be more in the nature of restrictions or limitations upon the commission in the matter of examinations of records of public utilities.

In order to determine a rate which will produce a fair return, it is essential to know the value of the property used and useful in conduct-

ing plaintiff's business. But an examination of its records has been so recently made that, as it appears to us, there is no necessity for a re-examination at this time, with the accompanying inconvenience to the gas company. According to the averments of the bill, which are undisputed, a complete and exhaustive search has been made within the last few months, and the commission already has or can get the necessary information without another examination of the same records.

An interlocutory injunction will therefore issue, restraining the commission from compelling the gas company to produce its records for another examination. We recognize the right of the commission to proceed to a revaluation, and it may apply for any information necessary to that end.

CLAYTON, District Judge (agreeing to order for injunction, but dissenting in part from the opinion prepared by Judge BRYAN). [3] The historical recitals of the present case, as made by Judge BRYAN, are correct as far as they go. But the statement should be supplemented by giving other provisions of the Act of October 1, 1920. It will be observed that the statute does not prescribe that the valuation fixed shall constitute a permanent valuation of the utility's property, but only that—

"then the valuation fixed in such report shall for all future rate-making purposes be the permanent basic valuation of the property of such utility." Section 16.

It was not the purpose to provide that the valuation thus fixed should never be changed; on the contrary, it is expressly provided by section 14 that—

"Upon the completion of the valuation of any utility, as herein provided, the commission shall thereafter keep itself informed of all extensions and improvements or other changes in the condition and values of the property of such utility, and shall ascertain the value thereof, and shall from time to time revise and correct its valuation to the extent *that may be necessary by reason of such extensions and improvements or other changes in the physical condition and resulting value of such property.*" (Italics supplied.)

There is, of course, a clear distinction between the establishment of a basic valuation of property in its then condition as of a certain date and a valuation fixed at a definite sum always being taken as the value of the utility's property regardless of changes in its condition and identity and of future fluctuations in prices. *That which the statute in this instance undertook to fix was a starting point in future valuations; that is, that the property of the utility was at the time of its valuation in its then condition worth a given sum of money. The benefit intended to be conferred by the fixing of this basic valuation was mutual. It relieved the state of the expense and burden of repeated detail estimates of the same thing, and it furnished to the utility a basis for credits.* It did not, of course, enable the utility to assure the investor that its properties would always remain of the same value regardless of changes in its condition resulting from the loss or deterioration of property or the additions thereto, but it was intended to enable the

utility to furnish some assurance to the investor that no change would be made in the valuation of its property, except such as were justified by the changes in its condition and identity and the fluctuations of market prices. It did not provide that the valuation established on a particular date would forever remain the accepted value of the property for all future time, but it did provide that in future valuations it would be accepted as true that the property of the utility in its then condition was on the date of the valuation worth the amount of the valuation.

If, however, the statute had gone so far as to provide that the amount of the valuation should be permanently accepted as the value of the company's property at any future time that a modification of the rate was under consideration, it would have gone no further than the many cases hereinafter cited, holding that it is entirely competent for a state and a utility to contract for a definite tariff of rates for an extended period. No difficulty is encountered from the use of the word "permanent," as the Supreme Court of Alabama has definitely construed such contracts on the part of the state or its subordinate governmental bodies as being operative for a period of 30 years, prescribed by the Alabama Constitution during which the franchise of a corporation may extend, or during the life of the franchise of the particular corporation, if it should expire at an earlier period. Mobile Electric Co. v. City of Mobile, 201 Ala. 607, 79 South. 39, L. R. A. 1918F, 667.

We are not, therefore, concerned with a contract fixing a definite sum as the permanent value of the property of the utility for all time to come, but only with a contract fixing a valuation as of a particular date as a basis or starting point for future valuations during a period of 30 years, or the life of the franchise of the Mobile Gas Company, should it sooner expire. The essential elements of a contract between the state and a public utility do not differ from those of a contract between two individuals; assuming that the subject-matter be lawful and the parties capable of contracting, it is only necessary that their minds should meet upon a common understanding and that each should part with a consideration. These principles have been so frequently applied in the decisions of the Supreme Court of the United States to contracts between a state and a utility in the matter of fixing the rates which may be charged by the utility that their application should be no longer doubted. Nor is it material whether the contract be entered into by direct action on the part of the Legislature of the state, or through some agency of the state, whether a Public Service Commission or other board, provided, of course, that the authority to make the contract is expressly delegated by the state to the commission. The intent on the part of the state to delegate authority must, perhaps, be clearer than in the case of an individual, but such authority when established, is equally effective.

By the terms of the act of the Legislature of the state of Alabama approved October 1, 1920 (General and Local Acts of Alabama Special Session 1920, p. 43 et seq.), it was expressly declared that the Alabama Public Service Commission might, upon its own motion, proceed to investigate, ascertain, and report the value of the properties of a public utility and—

"shall make such investigation, ascertainment and report upon the request and application of any utility. * * * . If such investigation and report be made upon the application of a utility, the same shall be made and the experts and assistants employed by the commission for that purpose, shall be employed at the expense of the utility making such application." Section 14.

After providing for the method of arriving at the valuation and for the report of such a valuation by the commission, it is then provided in section 16 that, if no protest is filed—

"then the valuation fixed by such final order thereon shall for all future rate-making purposes be the permanent basic valuation of the property of such utility."

It seems, therefore, to be plain that the state expressly authorized and directed the Alabama Public Service Commission to establish such a valuation as a permanent basic valuation whenever the utility should apply therefor, which application would be construed as an agreement on its part to pay the expense thereof. Here there was no uncertainty as to the subject-matter of the agreement. The fixing of the valuation as a permanent basis for future rate-making purposes, by mutual consent, was in itself a sufficient consideration. The fixing of a rate by charter or by a municipal corporation has frequently been held to constitute a binding contract, upon the theory that the fixing of the rate itself operated as a consideration, both on the part of the state and on the part of the utility; but in this case there was a further monied consideration moving from the utility, namely, the payment of the expenses of the valuation and the employment of the experts and assistants employed by the commission. It seems, therefore, to be impossible to doubt that there is present every element of contract whenever the utility, as in this case, applies for a valuation, the commission establishes the valuation, and the utility pays the expense thereof.

Here, then, we have every element of a contract—a plain offer on the part of the state to establish a permanent basic valuation of the utility's property for future rate-making purposes in consideration of the utility's accepting the same, and paying the expense thereof. Not only this, but the contract in this instance was entered into on the part of the state by direct legislation. It is true that the valuation was to be fixed by the commission, but it was not left to the commission to determine whether this should be done with or without a consideration, or whether under a contract, or otherwise. On the contrary, the statute itself prescribed a duty on the part of the commission to establish the valuation whenever the utility should demand the same, and the statute itself provided that such a demand should operate as a consent on the part of the utility to pay the expense thereof, and further provided the consequence which should follow, namely, that the valuation when made should be a final basic valuation. The commission acted merely as the servant of the state in fixing the value; the contract was made by the offer by the state contained in the statute itself, and the acceptance of that offer by the utility. The commission had no power to say whether it would contract or not, but to find the facts. The case seems to be analogous to that of where two men agree, one to buy and the other to sell, at a reasonable value to be fixed by an

290 F.—31

arbitrator, as is so common in building contracts, which refer such matters to the architect. It is for him to find the facts, but it is not he who contracts. That is done by the parties who made him the arbiter, just as the state and the utility in this instance; the duty was imposed upon the commission to fix the valuation under a contract between the state and the utility that, when once fixed, it should constitute a permanent basic valuation for future rate-making purposes by the state, whether acting through this commission or otherwise. However, the result would be the same if the contract had been entered into through the commission under authority from the state.

In examining the authorities upon this subject, it is essential to observe the distinction between those cases which involve the fixing of a rate by contract between individuals, or between municipal authorities or public boards which are authorized merely to exercise the usual powers of supervision over rates, without having any express authority to enter into contracts for the establishment of rates for an extended period, and those authorities which deal with contracts made by the Legislature itself or by some public commission which is authorized by the Legislature to contract on behalf of the state. Of course no person, municipal board, or state commission can bind the state as a party to a contract without authority from the state to do so, and it is equally clear that every contract entered into by those who are not authorized to bind the state is subject to police regulation by the state, and in the matter of rate making every contract fixing a given rate for a particular period, or permanently, to which the state is not a party, is made subject to the power of the state to exercise its ordinary function of rate regulation, but all of this does not in any wise conflict with the further proposition that it is entirely competent for the state itself, acting through its Legislature, or any other authorized agency, to enter into a contract fixing the rate for public service on the part of a particular corporation, and that when such rates are established by such contracts they are protected by section 10, art. 1, of the Constitution of the United States against impairment. Nothing, we think, could be better established. The distinction between the two lines of cases is simply a distinction between the acts of a person who has no authority to speak for the state, and the acts of a commission which is duly authorized to contract on behalf of the state.

In the case of Detroit v. Detroit Citizens' Street Railway Co., 184 U. S. 382, 22 Sup. Ct. 416, 46 L. Ed. 592, the Supreme Court of the United States said:

"It may be conceded that clear authority from the Legislature is needed to enable the city to make a contract or agreement like the ordinances in question, including rates of fare. But there can be no question in this court as to the competency of a state Legislature, unless prohibited by constitutional provisions, to authorize a municipal corporation to contract with a street railway company as to the rates of fare, and so to bind during the specified period any future common council from altering or in any way interfering with such contract."

The court there cites the following authorities: New Orleans Gas Co. v. Louisiana Light Co., 115 U. S. 650, 6 Sup. Ct. 252, 29 L. Ed. 516; New Orleans Waterworks Co. v. Rivers, 115 U. S. 674, 6 Sup.

Ct. 273, 29 L. Ed. 525; St. Tammany Waterworks v. New Orleans Waterworks, 120 U. S. 64, 7 Sup. Ct. 405, 30 L. Ed. 563; Walla Walla City v. Walla Walla Water Co., 172 U. S. 1, 19 Sup. Ct. 77, 43 L. Ed. 341; Los Angeles v. Los Angeles City Water Co., 177 U. S. 558, 570, 20 Sup. Ct. 736, 44 L. Ed. 886; Freeport Water Co. v. Freeport City, 180 U. S. 587, 593, 21 Sup. Ct. 493, 45 L. Ed. 679.

Surely it should be unnecessary to add anything further in order to establish the proposition that, when the state of Alabama authorized the Alabama Public Service Commission to fix a permanent basic valuation of the utility's properties for rate-making purposes, in consideration of the utility's accepting the same and paying the expense of making the examination and of employing the commission's experts and assistants, and when the utility accepted this offer and paid the expense, there thereby arose a contract between the state and the utility which cannot be impaired. We are relieved of the necessity of considering the effect of the provision that the basic valuation shall be permanent, as distinguished from the establishment of a basic valuation for a more limited period by the case of Mobile Electric Co. v. City of Mobile, 201 Ala. 607, 79 South. 39, L. R. A. 1918F, 667, hereinabove referred to in which the court considered a contract between the city and the utility which stipulated that it should be perpetual, and hold that it was, in effect, a contract for a reasonable time, which must be limited to the life of the charter of the corporation, not to exceed 30 years.

But this same question has been repeatedly decided by the Supreme Court of the United States. In the case of Dow v. Beidelman, 125 U. S. 680, 8 Sup. Ct. 1028, 31 L. Ed. 841, the court, quoting from the case of Stone v. Farmers' Loan & Trust Co., 116 U. S. 307, 6 Sup. Ct. 334, 388, 1191, 29 L. Ed. 636, said:

"It is now settled in this court that a state has power to limit the amount of charges by railroad companies for the transportation of persons and property within its own jurisdiction, *unless restrained by some contract in the charter* [italics supplied], or unless what is done amounts to a regulation of foreign or interstate commerce."

How, then, may we doubt that the power of the state may be restrained by a contract contained in the charter of the corporation, or how are we to distinguish between a contract contained in the charter of a corporation and a contract entered into by the state through a public board, which is expressly authorized to enter upon the same?

The precise question, as we understand it, came before the Supreme Court of the United States in the case of Bridge Proprietors v. Hoboken Land & Improvement Co., 1 Wall. 116, 17 L. Ed. 571, where the Legislature of the state of New Jersey had appointed a commission with powers to contract for the building of one bridge over each river, authorizing them to fix rates for tolls taken by the builders and grant them a right to these tolls for 99 years. The act also contained a provision that it should be lawful for any person or persons to build any other bridge within the limits which were defined on each side of these bridges, and the question presented was whether the contract thus made by the commission under authority from the Legislature was a contract

of the state, which was protected against impairment by the provisions of the Constitution, and it was there held that it was entirely competent for the state to delegate its authority to contract to the bridge commissioners, and that the contract, when entered into by them, became a contract of the state, and was protected against impairment by the constitutional provisions. This case was cited with approval in the case of New Orleans Gas Co. v. Louisiana Light Co., 115 U. S. 650, 6 Sup. Ct. 252, 29 L. Ed. 516, where it was declared:

"In Bridge Proprietors v. Hoboken Co., 1 Wall. [68 U. S.] 116, 17 L. Ed. 571, it was decided that a statute of New Jersey empowering certain commissioners to contract for the building of a bridge over the Hackensack river, and providing not only that the 'said contract should be valid on the parties contracting as well as on the state of New Jersey,' but that it should not be lawful 'for any person or persons whatsoever to erect any other bridge over or across the said river for ninety-nine years,' was a contract whose obligation could not be impaired by a law of the state."

The instances in which such contracts on behalf of the state have been entered into through commissions are not, however, confined to these cases. Mr. Justice Brown, in the case of Walla Walla v. Walla Walla Water Co., 172 U. S. 1, 9, 19 Sup. Ct. 77, 81 (43 L. Ed. 341), reviewed the earlier decisions and commented:

"It is true that in these cases the franchise was granted directly by the state Legislature, but it is equally clear that such franchises may be bestowed upon corporations by the municipal authorities, provided the right to do so is given by their charters. State Legislatures may not only exercise their sovereignty directly, but may delegate such portions of it to inferior legislative bodies as, in their judgment, is desirable for local purposes. As was said by the Supreme Court of Ohio in State v. Cincinnati Gaslight & Coke Co., 18 Ohio St. 262, 293: 'And assuming that such a power' (granting franchises to establish gas works) 'may be exercised directly, we are not disposed to doubt that it may also be exercised indirectly, through the agency of a municipal corporation clearly invested, for police purposes, with the necessary authority.' This case is directly in line with those above cited. See also Wright v. Nagle, 101 U. S. 791; Hamilton Gaslight & Coke Co. v. Hamilton, 146 U. S. 258, 266; Bacon v. Texas, 163 U. S. 207, 216; New Orleans Waterworks Co. v. New Orleans, 164 U. S. 471."

In the case of Los Angeles v. Los Angeles City Water Co., 177 U. S. 558, 570, 20 Sup. Ct. 736, 741 (44 L. Ed. 886) the Supreme Court of the United States said:

"This contention [that the city did not have the power to bind the state] is very comprehensive, and seems to deny the competency of the state to give the city the power to bind it. We do not, however, understand counsel as so contending, nor could they. Walla Walla v. Walla Walla Water Co., 172 U. S. 1. See, also, People v. Stephens, 62 Cal. 209."

This principle is expressed in the case of Pacific Mail S. S. Co. v. Joliffe, 2 Wall. 450, 17 L. Ed. 805, where a state statute, creating a board of pilot commissioners for the port of San Francisco, provided for the licensing of pilots and that when any pilot shall tender his services to a vessel, that vessel and its owners should become liable for half pilotage. It was held that the tendering of such services while the statute was in force created a contract that could not be affected by subsequent legislation.

In the case of Omaha Water Co. v. City of Omaha, 162 Fed. 225, 89 C. C. A. 205, 15 Ann. Cas. 498; Id., 218 U. S. 180, 30 Sup. Ct. 615, 54 L. Ed. 991, it is held that, where a franchise gave the city the option to purchase a waterworks system and provided for an appraisal to fix the value, the appraisal to be binding on both parties, and the city elects to purchase, and a board of appraisal is appointed and begins the appraisal, an act of the Legislature passed thereafter cannot give the city the right to reject the appraisal, without impairing the obligation of contracts, and the city, in spite of the statute, is bound by the appraisal.

In the case of Merchants' National Bank v. Escondido Irrigation District, 144 Cal. 329, 77 Pac. 937, an act providing for the organization of drainage districts was held to become a binding contract with the state upon the organization of the district under the terms of the act. And similarly it has been held in the case of Tennessee & Coosa R. R. v. Moore, 36 Ala. 371, that a state statute providing for a loan by the state to a railroad on its complying with certain requirements becomes a binding contract with the railroad, when it acts on the statute by complying with such requirements. The court, in discussing the power of the state to contract and the effect of its contracting, said:

"Although not delegated in express terms by the Constitution, the power of the Legislature to bind the state by contract is not open to question. It is one of the incidental powers necessary to the proper discharge of the functions of government, and is included in the general grant of 'the legislative power of the state,' which the Constitution makes to the General Assembly. Nor is the Legislature limited as to the manner in which it may contract, whether directly by statute, or through agents appointed for the purpose, in the ordinary form of contracts between individuals. Whatever its form, the contract of a state is, like any other contract, binding upon the parties; nor can the people, or their representatives, by any subsequent act of theirs, alter or annul it. When the contract is made, the Constitution of the United States acts upon it, and puts it beyond the power of any succeeding Legislature to impair its obligation."

In the case of American Smelting Co. v. Colo., 204 U. S. 103, 115, 27 Sup. Ct. 198, 201 (51 L. Ed. 393, 9 Ann. Cas. 978) it was said that—

"The principle that a contract may arise from a legislative enactment has been reiterated times without number."

This is undoubtedly true, and it is also undoubtedly true that each case will depend largely on the particular statute and the particular facts involved. However, an examination of the above authorities, I believe, will disclose the fact that wherever the state, by statute, has issued "a standing invitation" or has made "a proposal" to a particular class of persons, which calls on them to do some act to their detriment, or to the advantage of the state, and such person acts under the statute to his detriment on the faith of the statute, there is a binding contract which cannot be impaired by subsequent legislation. In 6 Ruling Case Law, § 331, p. 338, the text is:

"It has become the established law that a legislative enactment in the ordinary form of a statute may contain provisions which, when accepted as the basis of an action by individuals or corporations, become contracts between them and the state within the protection of the clause of the federal Constitution forbidding impairment of contractual obligations, and when

such a right has arisen, the repeal of the statute does not affect the right or an action for its enforcement."

In a gas rate case, Southern Iowa Electric Co. v. Chariton, 255 U. S. 539, 542, 41 Sup. Ct. 400, 401 (65 L. Ed. 764), Chief Justice White, for the court, said:

"That where, however, the public service corporations and the governmental agencies dealing with them have power to contract as to rates, and exert that power by fixing by contract rates to govern during a particular time, the enforcement of such rates is controlled by the obligation resulting from the contract, and therefore the question of whether such rates are confiscatory becomes immaterial. Freeport Water Co. v. Freeport, 180 U. S. 587, 593; Detroit v. Detroit Citizens' Street Ry. Co., 184 U. S. 368; Knoxville Water Co. v. Knoxville, 189 U. S. 434, 437; Cleveland v. Cleveland City Ry. Co., 194 U. S. 517; Home Telephone Co. v. Los Angeles, 211 U. S. 265, 373; Minneapolis v. Minneapolis Street Ry. Co., 215 U. S. 417; Columbus Railway, Power & Light Co. v. Columbus, 249 U. S. 399."

I think this Chariton Case is analogous in principle to the one here under consideration. On this subject Judge Westenhaver, in Columbus Ry., Power & Light Co. v. City of Columbus (D. C.) 253 Fed. 499, 503, rendered a very illuminating opinion reviewing the authorities on franchise contracts, and proceeds to say:

"The holding of all these cases is uniform. Of them the leading one is Cleveland v. Cleveland City Railway Co., 194 U. S. 517, 24 Sup. Ct. 756, 48 L. Ed. 1102. The law as settled by these cases is that the Legislature has by these sections delegated to municipal corporations full power and authority to enter into contracts for the maintenance and operation of street railway lines; that whatever the city in fact does pursuant thereto is the act of the state and is mutually binding upon the parties. Franchise grants for fixed terms not exceeding 25 years, and for a fixed rate of fare to continue during the term of such grants, may lawfully be made by the city under this legislative delegation of power. If the city passes an ordinance purporting to grant a franchise for a fixed term, with a rate of fare to endure during that term, and this ordinance is accepted, expressly or impliedly, a contract is engendered mutually binding and unalterable, except by the consent of both parties, during the term thereof."

The conclusion is that the state, by its statute, issued a standing invitation to every public utility to apply to the commission to fix a valuation upon its properties with the understanding that the utility should pay the expense thereof, and that when the valuation was thus fixed, it should constitute a permanent basic valuation for all future rate-making purposes. The utility accepted the offer and paid the expense. A contract was thereby entered into between the state and the utility, which the state has no power to impair.

It seems that Judge BRYAN relies largely in his opinion upon the title of the Act of October 1, 1920, but he does not quote the whole title, which is in these words:

"An act to enlarge the authority, powers and jurisdiction of the Alabama Public Service Commission so as to more effectively provide for the supervision, inspection and regulation by said commission in the public interest of the construction, maintenance and operation of public utilities and of their service, rules, regulations and practices; fares, rates and charges; facilities and plants; franchises, licenses and contracts; and their valuation, financing and securities; to provide for the payment of supervision and inspection fees by utilities, and to provide measures for the enforcement

of the commissioner's orders, and penalties for failure to comply with the orders of the commission or with the provisions of this act."

It is true that the provisions of section 2, article 4, of the Constitution of the state, declaring that "each law shall contain but one subject which shall be clearly expressed in its title," is mandatory; but its requirements are not to be exactingly enforced, or in such manner as to cripple legislation, and under this clause the title of the bill may be general, and need not specify every clause in the statute, for it is deemed sufficient if they are all referable to and cognate to the subject expressed. Further, when the subject is expressed in general terms, every necessary thing to make a complete enactment in regard to it, or which results as a complement of the thought contained in the general expression, is authorized and included in it. The limitation is that, if clauses contained in the act are not so related to the subject expressed in the title as to follow as a natural complement, they cannot stand. Ballentyne v. Wickersham, 75 Ala. 533, 536. See cases cited in footnote to section 45 of the Constitution, Code of Ala. 1907, vol. 3, p. 51.

It appears that argument is hardly necessary to demonstrate. that the act empowered the commission, after investigation, for which the company paid, to fix the valuation upon the property of such utility; and section 15 of the original Act of October 1, 1920, is correlated to the main purpose of the act, and provides that the valuation so fixed by such commission shall become final. And section 16 of the same act provides that:

"If no protest is filed as provided in section [15] hereof and such report of valuation by the commission becomes final as herein provided, then the valuation fixed in such report shall for all future rate-making purposes be the permanent basic valuation of the property of such utility."

It was under this act that the valuation was made and the expenses therefor paid by the gas company, and not under the Act of February 13, 1923. If the action had by the commission under the former act become a completed authorized contract, then, of course, the Legislature could not change the contract by the passage of the later act, if such has been attempted.

[4] Now, coming to the other feature of this case, involved in the consideration of the application for interlocutory injunction, my views are in harmony with those expressed by Judge BRYAN. The preliminary injunction as prayed for must now be issued. Application in the main suit, to which the present bill is supplemental, was made to the District Court by the Public Service Commission for an order requiring the gas company to submit its records for examination by the commission. This application was denied, for the reason stated in the opinion delivered by the District Judge. However it may be said here that the present supplemental bill avers that the commission caused the company's books and records to be thoroughly and exhaustively examined upon the company's application for valuation, and just prior to the entry of the commission's order of July 24, 1922, which is sought to be enjoined so as to prevent another examination of the company's records at this time, and this upon the ground that it

would constitute an unreasonable search, in violation of section 5, art. 1, of the Constitution of Alabama of 1901, which provides:

"That the people shall be secure in their persons, houses, papers and possessions from unreasonable seizure or searches, and that no warrants shall issue to search any place or to seize any person or thing without probable cause, supported by oath or affirmation."

The Fourth Amendment of the Constitution, referred to by Judge BRYAN in the opinion, does not apply to a case of search and seizure under state law, but it is a limitation only upon the powers of Congress, and not of the states. Spies v. Illinois, 123 U. S. 131, 8 Sup. Ct. 22, 31 L. Ed. 80. But that cannot affect the case here, for the theory of this supplemental bill is that, under the facts and circumstances of the case, the main case included, it would not be just to allow the commission to again and now subject the gas company to a re-examination of its properties, books, etc., and this District Court, composed of the three judges, unanimously agreed that such theory is correct, and is sustained by the facts and the law.

The examination of the records of the gas company has been so recently made that there is no necessity for a re-examination at this time with the accompanying expense and inconvenience to that company. The bill declares, and it is not disputed, that a complete and exhaustive search has been made within the last few months, and that the commission now has or can get the necessary information without an examination of the same books and records.

Interlocutory injunction should be issued, restraining the commission from compelling the gas company to submit to another examination of its books, records, papers, and property.