### COCKE et al. v. VACUUM OIL CO. et al.
### No. 6730.

Circuit Court of Appeals, Fifth Circuit.

Feb. 16, 1933.

Chas. B. Wood and R. Wayne Lawler, both of Houston, Tex., for appellants.

Wm. A. Vinson and Fred R. Switzer, both of Houston, Tex., for appellees.

Before BRYAN, SIBLEY, and HUTCHESON, Circuit Judges.

HUTCHESON, Circuit Judge.

Appellees are oil corporations adequately equipped with skill and capital and extensively engaged in prospecting and drilling for and producing oil in the Gulf Coast region of Texas and Louisiana. In the conduct of their business they acquire new territories and prospect them to develop new oil fields.

Appellants, dealers in oil and mineral leases, are engaged in the business of blocking up and leasing for resale to producers, likely oil territory. At a considerable cost of time and money they acquired a block of 7,000 acres of mineral leases in territory which, though not proven, had interesting geology. These leases they sold to appellees.

The contract prepared by appellees, after reciting an option on the property to take it over after it had been explored geophysically with a torsion balance, and that the option had been accepted, provided: "Now therefore, the Vacuum Oil Company for and in consideration of the transfer and assignment of the leases, has this day paid the sum of $12,500 cash, and further agrees as a part of the consideration for the assignment, that in the event that salt or caprock is encountered in drilling the first or any subsequent well, or in the event oil is discovered in the first or any subsequent well as the result of the operations of second party, second party shall at once pay to first party the sum of $25,000 in cash, and a further consideration of $75,000 out of $\frac{1}{4}$ of the first oil if, when and as produced and saved." This suit is to recover the $25,000 payable "in the event oil is discovered in the first or any subsequent well."

The District Judge, before whom the case was tried upon a jury waiver, denied recovery on the ground that though there was some oil, to wit, 112 barrels, discovered in the first well drilled, this was not a discovery of oil within the meaning of the contract. He held that the parties meant to say that $25,000 would be paid upon the discovery of an oil field; that is, upon the finding of oil in paying quantities.

Appellants contended below, and contend here, that this construction does violence to the contract; that what the parties intended to agree to, and what they did agree to, was to pay $25,000 when either of the three indicia of the presence of an oil field, cap rock, salt, or oil, was discovered in the first or any subsequent well. Whether the District Judge was right in his construction of the contract is the sole question on this appeal.

It is undisputed that appellees did discover, that is, find, oil; that is, some oil, in the first well that was drilled. If the case is to be determined upon the literal meaning of the words, it is plain that the District Judge was wrong. He thought that correct interpretation required the language to be construed in the light thrown upon the words by their use in the industry with which the contract had to do, and the special circumstances which attended its making. He thought this was a case in which "the principal apparent purpose of the parties should be given the greatest weight in determining the meaning to be given the words they used." Restatement of the Law, Contracts, § 236. He turned the case on his view of what this purpose was.

We think that he was right in refusing to decide the cause upon the detached dictionary meaning of the terms used. In the field of contract law, perhaps more than in any other, the "letter killeth, the spirit giveth life." It is therefore the office of interpretation to fully illumine words used in contracts that their meaning may be found. It is often almost, if not quite, true that in contracts words mean what their users choose them to mean, neither more nor less, for it is true of most words that their shades of meaning are many, and that they take their color and content from the context and the subject-matter in connection with which they are used. "Interpretation of words, and other manifestations of intention forming an agreement is the ascertainment of the meaning to be given such words and manifestations." Restatement of the Law, Contracts, § 226.

It is therefore settled that, though the "ordinary meaning of language throughout the country" is the meaning which prima facie interpretation gives to the words of a contract, and their plain meaning may not be distorted to force a desired construction, whenever a word having different shades of meaning is used, that meaning will be given to it which the context in which it is found, the business to which it relates, the circumstances under which it is used, show, in the light of the principal apparent purpose of the parties, that it was intended to have.

Recognizing that this is so, neither appellants nor appellees are contending for a dry construction. Each insists that, in accordance with these settled rules, the contract should be interpreted to mean what they contend for. Each recognizing the force of the rule that, "where the law gives to certain words an established meaning, this meaning is less readily controlled by the standard of interpretation otherwise applicable than is the meaning of other words" (Restatement of the Law, Contracts, § 234), endeavors to fix upon the disputed words "oil is discovered" an established legal meaning. Each turns to decisions on the law of oil and gas in which interpretation has consistently given great effect to "the principal apparent purpose of the parties," perhaps greater than in almost any other field of contract law. Cosden Oil Co. v. Scarborough (C. C. A.) 55 F.(2d) 634, 635; Cole Petroleum Oil Co. v. U. S. Gas & Oil Co. (Tex. Sup.) 41 S.W.(2d) 414; Texas P. Coal & Oil Co. v. Bratton (Tex. Civ. App.) 239 S. W. 688, 689; Sawyer v. Potter et al., 223 Ky. 359, 3 S.W.

(2d) 758. Appellees claim that these decisions settle that the principal purpose of the parties to obtain oil implies into the contract, where it is unexpressed, that oil should be found in paying or commercial quantities. Appellants point to the fact that these cases are all of development contracts between lessors and lessees where the prime consideration is the production of oil, and not, as here, speculative trading contracts between sellers and buyers of leases; that the dominant purpose in the cases cited which gave the words the meaning there contended for was the production of oil from the property, the prime consideration moving to the lessor for his lease, whereas the principal apparent purpose here of the contracting parties is the finding of such a favorable showing as would indicate, not the actual, but the apparent, presence of a field. They also cite decisions under the mineral statutes, McShane v. Kenkle, 18 Mont. 208, 44 P. 979, 33 L. R. A. 851, 56 Am. St. Rep. 579; U. S. v. Ohio Oil Co. (D. C.) 240 F. 996, 998, holding that discovery requires, not the finding of minerals in paying quantities, but the presence of indicia of mineral deposits which would reasonably presage their finding.

Coming to the words of the contract, appellees argue that the District Judge was right in finding that the parties, by using the word "encounter" as to cap rock or salt, and the word "discovery" as to oil, meant to use the first in the physical sense of making contact with the second, in the economic or commercial sense of development in paying quantities. Cole Petroleum Co. v. U. S. Gas & Oil Co., supra. Appellants, insisting that the agreement on which they sued is integrated of the letters exchanged and the final document signed, point to the fact that the words "encounter" and "discovery" have been used interchangeably in the written propositions anteceding,[1] and assert that no differentiating significance may be attached to the use of the two words in the final draft.

[1] The first letter submitted two alternative propositions: (1) A cash payment of $14,500, and, "in the event that salt or caprock is encountered in drilling, or in the event that oil is discovered," etc., (2) a proposition for a five weeks' option to torsion balance the prospect $3,500 paid, and, if the option was exercised, the payment of $12,500 cash, and, "if drilling results in the discovery of caprock, salt or oil, you are to pay cash and oil bonus as recited in the first proposition." Appellees, accepting the second proposition, wrote: "We accept your second proposition that is, we shall have five weeks to torsion balance the prospect. * * * Should we exercise our option we will pay $12,500 additional, * * * and a cash payment to you of $25,000 on the discovery of oil, caprock or salt, and $75,000 to be paid to you out of ¼ of the first oil produced."

As to the principal apparent purpose of the parties, appellants insist no other conclusion can be reached than that it was to accord them the right to have the $25,000 when any one of the three favorable indicia of the presence of an oil field, cap rock, salt, or oil, was found in any well drilled. All of their witnesses testified that the finding of actual oil sand capable of producing, and which did produce, 112 barrels of oil in the first well, was just as good an indication as the finding of either cap rock or salt, while most of them testified that it was a better one. All testified that such a showing presaged an oil field, and that it was more than sufficient to justify a reasonably prudent operator in expending further large sums under the reasonable expectation of finding oil in commercial quantities, in an effort to locate a field. It was in proof, without dispute, that practically no new field in the Gulf Coast has been discovered by the drilling of one or two wells; that sometimes as high as thirty to fifty wells have been drilled before the field has been brought in as a commercial paying field. These witnesses all testified that the finding of oil in connection with the geophysical tests previously made was the strongest kind of an indication that there was a field there, and that, after this discovery, the prospect was of great commercial value, and could have been sold for a sum greatly in excess of the $25,000. Appellees say that these facts, in connection with the further fact that appellees took no obligation as lessors take in oil leases, to appellants to actually produce for or pay them any amount of oil, but, on the contrary, expressly qualified their obligation in that regard by the "if, as and when" clause, make it entirely plain that as between the contractors the principal apparent purpose as to when the $25,000 should be paid was not upon the production of oil, but the finding of one of the indicia of the presence of an oil field. That the $25,000 was to be paid, not after or out of the finding of oil in paying commercial quantities, but after the finding of oil, giving significance to the geophysical picture, and a value to the prospect which would have enabled appellees to resell it at a profit, or, if they preferred to do so, to prospect it for themselves, with confidence in a favorable outcome. Appellees' witnesses gave no testimony in substantial conflict with these contentions. Mr. Sutton, the Southwestern manager who made the contract for appellees, himself testified that, when the oil was discovered in the well, they thought they had an oil field, and that its finding there con-

sidered in connection with the geophysical tests made in the field made them think the subsequent expenditures were justified. The testimony of Rosaire, the geophysicist whom appellees called in only after they had drilled a dry hole following the finding of oil in the first well, amounts to no more than that he sedulously put aside from his consideration the fact that oil had been found, so that he could base his advice as to whether they should consider drilling, on the geophysical picture alone. He testified: "Naturally I knew some oil had been produced from that well, and we watched that work with more interest than we would have watched a wildcat prospect," while Mr. Sutton, a practical oil man, testified: "It is a tremendous stimulus to scientific curiosity when oil is found on top of the geophysical picture because the oil tends to confirm what that picture shows." Further, it was in proof that, after Rosaire had advised them on the geophysical picture to sink no more wells, they sunk another.

When these facts are considered in the light of the carefully chosen language in which the contract was finally drawn by appellees, and in the further light of the rule that, "Where words or other manifestations of intention bear more than one reasonable meaning, an interpretation is preferred which operates more strongly against the party from whom they proceed" (Contracts—Restatement, § 236), we think interpretation requires that the contract be read as it was written. As written, it provides for the payment of $25,000, not "if an oil field is discovered," not "if oil is discovered in paying or commercial quantities by reason of drilling the first or any subsequent well," but "if oil is discovered in the first or any subsequent well." If, as appellees claim, it had been intended to provide for the payment of that sum if an oil field were discovered, language more inapt to express that intention could hardly have been chosen. If, as appellants claim, it was intended to provide for the payment upon the finding in the first or any subsequent well of any one of the indicia of an oil field they had selected, salt, cap rock, or oil, more apt, more appropriate language could not have been chosen.

We think that what the parties intended by their contract, that is, its principal apparent purpose, was that, upon the finding by the buyers of one of the indicia selected by them as a reasonable enough presage that an oil field had been discovered, to justify further development, the money should be paid to the sellers. We think that this was a contract, not for the discovery of an oil field, but of signs and portents of such a field; that one of these signs appeared; that appellees got their bargain, that which they had agreed to pay $25,000 for; that they cannot, because subsequent developments have proved disappointing, escape paying for it as they agreed to do.

The case having been tried on a jury waiver, and the facts fully developed, the judgment is reversed (Bank of Waterproof v. Fidelity & Deposit Co. (C. C. A.) 299 F. 478, 483), and the cause is remanded to the District Court, with directions to enter judgment for plaintiffs for $25,000, with interest from the date of the discovery.