**LEA et al. v. VASCO PRODUCTS, Inc.**

No. 8523.

Circuit Court of Appeals, Fifth Circuit.

Feb. 19, 1938.

Edwin R. Dickenson and Maynard Ramsey, both of Tampa, Fla., for appellants.

Wm. M. Taliaferro, of Tampa, Fla., and George E. Edelin, of Washington, D. C., for appellee.

Before SIBLEY, HUTCHESON, and HOLMES, Circuit Judges.

HUTCHESON, Circuit Judge.

The suit was for specific performance of, and for an injunction as to, a written lease to appellee for 99 years of the sole and exclusive rights the world over to sell and distribute "Lea's Never-Failing Hair Tonic," the product of a supposed secret formula. The claim was that though plaintiff had in good faith complied, and was complying with its terms, as the parties to it had interpreted them, the defendants were refusing to do so, and in violation and breach of its terms, had declared the lease contract terminated and at an end, and were interfering with and preventing plaintiffs from proceeding under it; that both the terms of the lease contract and defendant's conduct entitled plaintiffs to a decree.

The defense was that the contract specifically required plaintiff to sell during the years 1930, 1931, and each year thereafter, 1,250 gallons of the tonic, and that by clause 11 thereof it was provided that, should plaintiff in any year fail to sell that amount, the contract should become null and void. That plaintiff failed in the contract year ending in April, 1935, to sell 1,250 gallons as required, and that defendants had because thereof, and in accordance with its provisions, terminated the contract. It was further alleged that plaintiff was not proceeding

in good faith to comply with the contract, but had deliberately ceased advertising and pushing the sale of the product.

Plaintiff in reply denied that the contract required the sale of any particular gallonage. Alleging that it required only good-faith efforts to sell, it explained the cessation of its advertising as the result of a Federal Trade Commission proceeding begun in 1932, and terminating in 1935, in a cease and desist order; that the preliminary proceedings and the final order had greatly limited, and would in future greatly limit, the scope and effect of the advertising, in that it had been prevented thereby from making most of the claims defendants had made for the product, and particularly from advertising it at all as a tonic; that notwithstanding these difficulties, including the defense of the proceeding at its own cost, it had in good faith done, and would in future do, all that it could to promote and further sales.

The District Judge granted an interlocutory injunction, preserving the status quo until the merits could be tried. This order was affirmed, on defendant's appeal, as not an abuse of discretion. 5 Cir., 81 F.2d 1011.

At the conclusion of the trial on the merits the District Judge, agreeing with plaintiff that the contract by its terms, and particularly as it had been interpreted by the parties to it, did not require the annual sale of any specific quantity, but only a good faith effort to sell, and the payment of the stipulated monthly royalty, so found. He found, too, that plaintiff had acted throughout in good faith, and that the agreement was in full force and effect. He further found that if, strictly construed, the contract could be interpreted as providing that, unless a specific amount of gallonage should be sold, the lease would come to an end, the facts in evidence show such conduct of defendants as constitutes a waiver of such a construction, and an acquiescence in the one plaintiff contends for, and raises an estoppel against them to now claim a forfeiture. Awarding plaintiff the full relief it asked, the decree ordered defendants to specifically perform their part of the contract, and enjoined them from selling or distributing the product, and from interfering with plaintiff's doing so.

Defendants have appealed. This is the record.

In 1926, after the Leas had been for twelve or fourteen years engaged in making and selling the product under the name and claim the name carries, the plaintiff Vasco made with them the written agreement which underlies this suit. The agreement, in form a leasing and letting for 99 years, of the sole and exclusive world-wide right, privilege, and authority to sell and distribute the product of the Leas' secret formula, provided: That the formula, as well as the process for making the product, would be deposited in escrow in a sealed package; that the Leas would not disclose the formula, would protect the name and trade-mark, and would not, during the continuance of this agreement, sell or distribute any other hair tonic; and that Vasco, during the life of the agreement, would not manufacture, distribute, or sell any other medical preparation or product under any similar name.

The clauses which have particular bearing on this controversy are the ninth, tenth, and eleventh. The ninth clause provided that within 30 days thereafter, Vasco would order not less than 300 gallons of the hair tonic, and that it would "thereafter use its best efforts to promote the sale and distribution of the product to the end that there may be ordered, sold and distributed" during the second, third, and fourth 12 months' periods after the agreement date, not less than 500, 750, and 1,000 gallons, respectively, and "during the fifth twelve months' period and annually thereafter, not less than 1,250 gallons of said product."

By the tenth paragraph Vasco agreed to pay on all the product ordered by it, certain costs of manufacture and freight, and on the 20th day of each month for the first, second, third and fourth twelve months' periods $100, $125, $150, and $175, respectively, and for the fifth 12 months' period, and for each year thereafter, $200 per month, and in addition, at the end of each 12 months' period, $1 per gallon for each gallon in excess of the minimum for that period, up to 1,500 gallons, and for all over 1,500 gallons, 75 cents per gallon.

The eleventh paragraph provided that if Vasco "should fail to order, sell, and distribute in any twelve months' period the minimum gallonage agreed upon, or should fail to pay royalty when due," or fail in other respects set out in the agreement, " * * * this agreement shall become and be thereafter null and void," and that, "in the event this agreement shall be so terminated," all rights of Vasco to sell or in any way deal with the product shall cease.

After the execution of the contract plaintiff put on a vigorous advertising campaign to sell the product, which finally came to represent 80 per cent. of its business, with steadily increasing sales as the advertising increased. This campaign culminated in the expenditure for the year ending April, 1930, of $51,606, April, 1931, of $44,179, and April, 1932, of $23,791.77, in all more than $120,000 for the three years. As the result of this advertising plaintiff sold in the contract years ending in 1930, 1931, 1932, 2034, 1,770½ and 1,320 gallons, respectively. In the contract years 1933, 1934, and 1935, in which substantially no advertising was done, the gallonage sold was, respectively, 992¾, 910, 750⅔.

Appellants' claim, that the failure to advertise in these years was deliberate, because appellee had found that it could make more for itself, though less for appellants, by not advertising, is not sustained by the record. The reason appellee stopped advertising was, that on April 6, 1932, the Federal Trade Commission, on charges that the statements in the advertising that the preparation was a tonic, that it could restore hair to its original color, and other like claims, were false and misleading, instituted a proceeding against Vasco Products, doing business under the name of Leas Tonic Company. This proceeding, which began with the April 6 notice to Vasco, was followed by a presentation in 1933 to the Vasco Company and the Leas, of a stipulation to be signed by them, admitting that the statements in their advertising were untrue and misleading, and agreeing to cease and desist from representing, in advertisements or otherwise, that by the use of the product gray hair could be restored to its natural color, youthful hair be regained, dandruff be banished, and gray hair and scalp troubles gotten rid of.

Both Vasco and the Leas refused to enter into the stipulation. In September, 1933, the Federal Trade Commission filed a formal complaint against both of them, charging them with false and misleading advertisements as to the efficacy and effect of the compound, and fixing a hearing date upon the complaint. After some considerable period of taking testimony, this proceeding, in which Vasco represented the Leas under power of attorney, came to an end in a cease and desist order, based on findings of fact and conclusions sustaining the charges in the complaint; that the compound was not a secret or new discovery, but the ingredients of it had been known even in ancient times; that it would not restore the natural color of, and had no tonic effect on, the hair; in fact was not a tonic, but a dye; and that both respondents had been making false and misleading claims for the product. The cease and desist order, among other things, required Vasco to desist from representing that by the use of the compound "youthful hair could be regained," "its previous color could be restored to gray hair," that "the use of the compound would banish dandruff," and finally, from using the name "tonic" at all in advertising the product.

On the trial of this case plaintiff's witnesses testified, and the record bears them out, that because of and after the commencement of the Federal Trade Commission proceedings, Vasco had to cease advertising, but that it has faithfully endeavored to push sales in other ways, and that now that the Commission proceeding is over, it would proceed again to advertise, but within the limitations of the "cease and desist" order.

In August, 1934, while the Commission proceeding was pending, and after plaintiff had written them, calling attention to the difficulties they were having, and the falling off of sales, and urging them to consider accepting less royalties, defendants undertook to invoke the provisions of paragraph 11, and by letter notified plaintiff that because of its failure to sell 1,250 gallons in the years ending in April, 1933, and April, 1934, the lease was at an end. Thereafter, defendants agreed that their receipt of royalties during the contract years ending in April, 1933 and 1934, with knowledge of the failure to sell the minimum gallonage in both of those years, was a waiver of the right to bring the contract to an end for the failure in those years, and in October, 1934, defendants advised plaintiff orally and by letter, that the letter of cancellation was withdrawn, and no further action would be taken with regard to it. In the conferences which preceded the withdrawal of this letter, nothing was said about holding plaintiff to the strict terms of the contract for that current year, though defendants then knew that the sales had greatly fallen off, and that the defendant had not sold, and would not be able to sell, the minimum plaintiff had set, of 1,250 gallons in the current year. When, however, on April 19, 1935, plaintiff made its annual report showing that for that lease year it had again failed to sell the

minimum quantity, and had sold only 750 gallons, defendants, on April 21 again invoked paragraph 11 of the contract, denounced the contract as at an end, gave notice that they would refuse to comply further, and began to manufacture, advertise, and distribute the product for themselves. Plaintiff, however, insisted on holding to the contract, and securing the temporary injunction above referred to, continued under it as before.

We think the evidence, particularly that in regard to the Trade Commission's action, fully supports the finding that plaintiff was, when the suit was filed, in good faith, and under greatly adverse circumstances, in large part the fault of defendants in overclaiming for the product, endeavoring to sell and distribute it. If then, as the District Judge thought, plaintiff's only obligation under the lease was in good faith to use its best efforts to sell the stipulated quantity, the decree was right. But the use of good faith, while undoubtedly a part of, by no means satisfied the obligation of, the lease. This, by its express terms, could be satisfied only by the sale in each year of the minimum quantity stipulated for. By its express terms failure in any year to sell and distribute the minimum stipulated quantity rendered the agreement null and void.

■ Nothing in the express terms of the lease, nothing in the nature of the enterprise it was entered into to foster, nothing in the circumstances under which it was executed, or its execution entered upon, nothing in the conduct of the parties, gives rise or lends support to the view appellee prevailed upon below, that the principal apparent purpose of the parties in entering into the lease contract, Cocke v. Vacuum Oil Co., 5 Cir., 63 F.2d 406, was not to require the sale annually of the stipulated minimum, but to secure for defendants the stipulated royalty and the obligation of plaintiff merely to use good faith in pushing the sale of the product. Every provision of the lease, including that in the ninth paragraph on which plaintiff mainly relies, that "it will use its best efforts to promote the sale, etc.," is of an exactly contrary purport. That provision, which continues, "to the end that there may be ordered, sold and distributed" during the second, third, fourth, and fifth periods and annually thereafter, not less than 500, 750, 1,000, and 1,250 gallons, respectively, of said compound, as every other provision of the lease does, shows the end and

object of its making and its principal apparent purpose. That purpose was to stimulate and secure an ever-increasing use of, an ever-widening market, for the product, to the end that the lessors, and those in privity with them, during the continuance of the lease, should enjoy an ever-increasing royalty, and that upon its termination, either before or at its natural end, they should receive back a built-up business in a widely distributed product.

The parties then having thus expressly provided that upon failure in any year to sell the minimum stipulated amount, the lease should become null and void, and be at an end, and plaintiff having failed to sell that amount, the defendants were within their legal rights in declaring it terminated for failure to sell the required quantity, Fenn v. Pickwick Corporation, 117 Cal.App. 236, 4 P.2d 215, 16 R.C.L. 1116; Summers Oil and Gas, § 146, p. 471, and a court of equity will not interfere with or prevent their doing so, Meier Dental Mfg. Co. v. Smith, 8 Cir., 237 F. 563, unless the breach is due to the fault of the lessor, Summers Oil and Gas, § 160, p. 503; Morgan v. Houston Oil Co., Tex.Civ.App., 84 S.W.2d 312; Brewster v. Lanyon Zinc Co., 8 Cir., 140 F. 801; Sauder v. Mid-Continent Petroleum Corporation, 292 U.S. 272, 54 S.Ct. 671, 78 L.Ed. 1255, 93 A.L.R. 454, or under all the circumstances, particularly the conduct of lessors, it appears that a strict forfeiture is inequitable as imposing an undue hardship on the lessee, and equity can relieve against it, while at the same time protecting lessors from damage or injury. 16 R.C.L. 1119, 1146 to 1151, incl.; South Penn Oil Co. v. Edgell, 48 W.Va. 348, 37 S.E. 596, 86 Am. St.Rep. 43, 69 L.R.A. 858; Dunklee v. Adams, 20 Vt. 415, 50 Am.Dec. 44; Hemphill v. Pesat, 98 Fla. 124, 123 So. 561.

■ In the lease contract the lessors guaranteed that lessee should "at all times have full and exclusive enjoyment and use of the trade mark 'Leas Never-failing Hair Tonic' free of loss or molestation * * * by the order of any civil or military authority or otherwise." In connection with the advertising, lessors procured testimonials and made claims which are largely the cause of plaintiff's difficulties with the Trade Commission, as a result of which the advertising was stopped, and the marketing of the product cut down in the years ending 1933, 1934, and 1935. For it may not be doubted that the parties to the contract contemplated that the product was to be advertised and

sold under the claims the Leas made for it, and that plaintiff, until its activities were stopped by the action of the Federal Trade Commission, had not only faithfully, but effectively, carried out its agreement to push the product, spending large sums of money to do so. Neither may it be doubted that when the Trade Commission trouble began, both Vasco and the Leas were in agreement that until this trouble was cleared away, the product could not be advertised and pushed as before. It is this trouble which accounts for the failure to advertise, and the dropping off of sales. It is this trouble which accounts for the effort of the Leas in 1933 and 1934 to cancel the contract, when Vasco suggested that because of the difficulties they should consider a reduction of the royalties. It was the existence and continuance of this proceeding, and the idea Lea apparently had, that by canceling the lease with Vasco, he could somehow get rid of the pending Trade Commission proceeding,[1] and not the mere failure of Vasco to sell the stipulated amount, which caused the Leas, in 1935, to again give notice of forfeiture.

But the troubles with the Trade Commission, by defendants overclaiming for its product is not the only fault of defendants to which plaintiff's failure to sell the minimum quantity in the fiscal year ending in 1935 can be traced.

In the middle of that fiscal year defendants wrongfully interfered with plaintiff's sales by giving notice that the lease was terminated, and it was some months later before they admitted that their action in this respect was wrongful. Further, when they withdrew the notice of termination, they did so without giving any notice or intimation that they would attempt to claim forfeiture at the end of the fiscal year, though they knew then that their overclaiming for the product and their notice of cancellation had brought about conditions under which it would be impossible for plaintiff in that year to sell the required quantity.

When all these circumstances are considered, in connection with the further facts; that the lease had been in force for nearly ten years; that plaintiff had, until the Commission proceeding stopped them, spent large sums of money to market and distribute the product; had on the whole, though not year by year, sold considerably more of the product than the minimum quantity the lease contract required, and had in each year faithfully paid the stipulated royalty, we think it plain that the forfeiture should have been relieved by a properly conditioned decree. C/f Amerada Petroleum Co. v. Doering, 5 Cir., 93 F.2d 540.

As far as the record shows, the failure was only temporary and due to a temporary condition, the pendency of the Trade Commission proceeding, and the acts of the defendants in wrongfully terminating the contract. The Trade Commission proceeding out of the way, there was a strong expectation that the lessee would be in a position in the future to faithfully perform the provisions of the lease. Though the decree appealed from was entered in March, 1937, no inquiry was made, no evidence taken as to the result of plaintiff's operations for the fiscal year ending in 1936, neither, of course, was there any evidence in the record as to sales for the year ending in 1937, or up to the present time in 1938, nor any as to the probability in the future of plaintiff's performing the covenants of the lease as it had agreed to do.

We are therefore in no position to frame a decree, but must remand the cause to the District Court, with directions for a hearing upon whether there is or is not a strong expectation and probability that plaintiff will, in the future, be able to comply with the peremptory terms of the lease, and for the framing of a decree accordingly. If such a showing is made, an analogous decree to that entered in the Amerada Petroleum Co. Case, supra, should be framed, awarding plaintiff an injunction against the termination of the lease, conditioned that within a reasonable time, not exceeding one year, it is able to demonstrate that it can perform the peremptory terms of the lease. If the hearing fails to show a strong expectation, and a reasonable probability that

---

[1] "Mr. George E. Edelin,

"1518 K St. N W

"Washington, D. C.

"Dear Mr. Edelin: As you know, the contract of the Leas Tonic Company has been cancelled with Vasco Products, Inc. and this automatically ends the case of the Federal Trade Commission against Vasco Products, Inc.

"No doubt we will have trouble with the Trade Commission and wondered if at such time you would be interested in the case.

"Thanking you, I am,

"Yours very truly, W. M. Lea."

plaintiff can in the future comply with the peremptory requirements of the lease, the bill should be dismissed for want of equity.

Reversed and remanded, with directions.